IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| TAMMY D. KARTHAUSER and<br>VON KARTHAUSER, wife and husband, | ) | No. 71733-2-I |
| | ) | |
| Respondents, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| MACKENZIE ADAMS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: June 23, 2014 |
| | ) | |

BECKER, J. — The amount of damages is a question of fact to be decided by the jury. So long as the jury's award is within the range of substantial evidence in the record, it will not be disturbed. Because there was substantial evidence to support the award of $165,000 in this case, we affirm.

Tammy Karthauser sued Mackenzie Adams for personal injuries sustained in a car accident on March 29, 2011. Karthauser claimed injuries to her neck, right shoulder, and lower back and hip from the accident. By the time the case went to trial, two issues remained: (1) whether Adams was negligent when she hit Karthauser, and if so (2) the amount of damages. The Honorable Michael Sullivan of Wahkiakum County presided over trial as a visiting judge.

At trial, Karthauser's witnesses were her treating physical therapist, five family members, and the responding state trooper. The trooper testified that when he asked Adams what happened, she reported having no memory of the accident. He said she had no obvious signs of head injury and did not report dizziness or loss of consciousness.

The physical therapist testified that Karthauser came in for 28 physical therapy appointments with him and did 10 massage therapy sessions with another member of his office. He testified that, assuming Karthauser continued to have the same pain she had when therapy ended, he did not expect that she would ever return to her preaccident status. But he did say that, should she win a judgment in court, she would have the money to return to therapy and would experience some temporary pain relief.

According to her family, Karthauser's life before the accident revolved around hunting, camping, dressing big game, and cooking for large family gatherings. They said she is now unable to participate in these activities to the extent she used to because of pain from the accident. Both her sister and her stepfather estimated that she is 25 percent of her preaccident self.

Karthauser testified last. She described the accident and said she had no preexisting injuries. On direct examination, she testified that after the accident, she had trouble providing care to the man the State paid her to take care of:

> Q. . . . You know, at the time of the crash you were an in-house
>    care giver for the same guy; is that correct?
> A. Yes.
> Q. And the State was paying you, is that right?
> A. Yes.
> Q. Does the State continue to pay you now?

2

A. No.
Q. Well, why doesn't the State pay you if you're still sitting there taking care of this guy?
A. I can't do everything I did before.
. . . .
Q. Well, as an in-home care giver, aren't you expected to get this 300-pounder in and out of a bathtub?
A. I have to assist him.
Q. Okay. Before could you do that?
A. Yes.
Q. Can you do it now?
A. No.
Q. Your son, Vaughn, Jr., lives with you, he's 18, is that right?
A. Yes, he is.
. . . .
Q. . . . Is he a strapping strong young kid?
A. He's a big boy.
Q. Big boy? Without Vaughn, would you be able to assist this guy in and out of the tub and clean up after him and do all the stuff you have to do for a 70-something-year-old 300-pounder?
A. He's 71; no, I would not.

The court admitted a number of exhibits that Karthauser offered in support of her claims. These included the 9-1-1 response reports from the fire department, her medical and physical therapy bills, her physical therapy records showing continuing pain in the low back and hip that was unresponsive to treatment, a Kelley Blue Book printout for her totaled car, and the towing bills from the night of the accident.

Adams was the only witness for the defense. She testified that at the time of the accident she was four months pregnant and had been at her ex-boyfriend's home to show him pictures of her ultrasound. She said she had gotten dizzy a few times during her pregnancy. She said that all she remembered of the accident was a large rock that sits to the side of the road approximately three car lengths from the intersection. According to Adams, she blacked out suddenly

3

and does not remember anything until she was sitting in the back of "some guy's car" calling her parents.

At the close of evidence, Adams orally moved for judgment as a matter of law that Karthauser had no evidence supporting an instruction for future economic damages:

> MR. MITCHELL: And there's maybe a claim for future medical bills, at least I'm not sure if there is. But I would move for those claims being stricken or a directed verdict against them for the reason there's no evidence of either that was raised. There was some discussion by the physical therapist that Plaintiff might benefit from some future treatment with him. He didn't talk about how much, he didn't talk about what restrictions she has, if any, and none of the medical records talk about her having restrictions or work issues that relate to this accident.
> For those reasons and because there was no claim for diminished earning capacity in any of the interrogatories or statement of damage before trial, that category should not be allowed either. Neither one—there was no claim for any future damages pertaining to impaired earning capacity or medical bills in the future, so I would move that those—
> THE COURT: So future medical bills, not future earnings?
> MR. MITCHELL: Future earning capacity or diminished earning capacity.
> MR. CRANDALL: Yeah, diminution—
> THE COURT: Well, I have that as the—
> MR. MITCHELL: And also future medical bills. Same argument on both, essentially.

Karthauser responded that there was sufficient evidence of future economic damages to defeat Adams' motion:

> MR. CRANDALL: Okay. My client took the stand and said that she can no longer perform the duties that she was doing before the crash. She said that was the reason in fact she no longer gets a check from the State and she has been hired privately by this elderly gentleman for whom she cares. She testified that currently the heavy lifting is done by her 18-year-old son.
> She also testified that he is not going to live with her forever and she will be unable to take care of him, even at this reduced income that she's getting now.

> The physical therapist said that, more likely than not, she's not going to improve. However, she might be able to improve slightly with additional treatment, and he doesn't know for how long she will improve.
>
> The diminution of earning capacity is not a lost wage claim. It is a claim that she can no longer earn the amount of money she earned before, based on her physical disability stretching into the future. Many people with a diminution of earning capacity continue on with their regular job and still are entitled to a judgment in the amount proven.
>
> In this particular case she does continue on with her job, she just does it at a reduced level. She has waived her lost wage claim. That would be the difference between what the gentleman is paying out of pocket as opposed to what the State is paying. There was no rebutting evidence. There was no objection. That evidence is before the jury and I'm entitled to the instruction.

The court denied the motion.

The jury was instructed as to both economic and noneconomic damages. Instruction 10 said that if the verdict was for the plaintiff, it had to at least include undisputed past economic damages of $12,617.23.

The jury was told to consider, as elements of future economic damages, the reasonable value of earning capacity with reasonable probability to be lost in the future, and future medical costs. The instruction on noneconomic damages stated as follows:

> In addition you should consider the following noneconomic damages elements:
> a) The nature and extent of the injuries;
> b) The disability and loss of enjoyment of life experienced and with reasonable probability to be experienced in the future; and
> c) The pain and suffering, both mental and physical, experienced and with reasonable probability to be experienced in the future.
>
> The burden of proving damages rests upon the plaintiffs. It is for you to determine, based upon the evidence, whether any particular element has been proved by a preponderance of the evidence.

5

Your award must be based upon evidence and not upon speculation, guess, or conjecture.

The law has not furnished us with any fixed standards by which to measure noneconomic damages. With reference to these matters you must be governed by your own judgment, by the evidence in the case and by these instructions.

Karthauser's attorney discussed damages during his closing argument. He asked the jury to award all the past economic damages, including some disputed items, for a total of "about 14 grand, give or take." Without suggesting a particular amount, he asked the jury to also award to Karthauser the reasonable value of earning capacity likely to be lost in the future. He asked for $6,000 for future medical care:

Anyway, future medicals. If you're going to give her some money—I wouldn't say give her some money because she has earned the money you award—give her something—and I'm suggesting looks like she spent about 6300 bucks at PT Northwest between the massage and the physical therapist. Give her another 6,000, see what happens. If it works, then maybe she'll take money from another award that you give her in another category and plug it into that. Maybe a chiropractor, who knows?

He then read to them the portion of the instruction dealing with noneconomic damages and walked them through various ways they could put a value on noneconomic damages:

Couple little factors you might want to think about. First is, I think as of this year Washington's minimum age is, like, $9.19 an hour. Federal poverty level for one person is, like, 11, 4 a year— 11,400 a year. So, while the law has not given you a fixed standard for determining pain, suffering, disability, loss of enjoyment of life and all this other stuff, the law has certainly given you ways to compute it.

But wait a minute, I'm not going to pull a fast one on you. I know you all have phones with calculators on them, you're going to have to figure it out. If we use the job scenario, what would happen—and I'm not suggesting this, I'm just showing you—it's like a math class in elementary school, I'm walking you through a math

problem. Minimum wage is 9.19. No, no, no, don't pay her, she's unskilled.

Oh, wait a minute, that's what it's for. Give her five bucks an hour, 12-hour day, we'll do the nights for free because, you know, she'll sleep some of that. Well, that works out to . . . 21,672 a year times 38.[1]

Whoa, whoa, that's a big chunk of money . . . Man, maybe we ought to use a different method. Maybe we ought to use a— you can use that method, won't offend me, but what if we used the chunk method? You pull a chunk out of the sky. Well, what if we give Tammy 150,000 bucks for this lifetime?

Well, let's subtract 14,000 she's gotta pay for all those outstanding medical bills. That leaves 136,000. And let's—I'm just pulling this out of the sky. You know, she ran up a bill for about 6300 bucks, let's just round it to 6,000 where she can take a stab at physical therapy again, maybe a chiropractor. So let's subtract that and that leaves 130,000. Let's divide that by 38 years. Well, that comes out to less than 3500 bucks a year, works out to less than 285 a month.

Now, that doesn't sound too outrageous. . . . You know, 285 a month when it's no skin off Ms. Adams' nose—maybe that's not completely unfair.

He finished by appealing to the jurors as taxpayers:

Because if she doesn't get anything and she continues to deteriorate, us taxpayers are going to be paying for her. Do you want to pay for her?

Adams objected, and the objection was sustained.

Adams' attorney discussed damages in his closing as well. He told the jury that not only was there no claim for lost income, "we don't even know what her income is." He questioned the evidence of future economic damages, emphasizing the dearth of medical testimony and the lack of evidence of pain medication after treatment ended. He suggested that if the jury found for Karthauser, they should award in the range of $5,000 to $10,000 in noneconomic

---

[1] The jury was instructed that a woman of Karthauser's age has a life expectancy of approximately 38 years. Twenty-one thousand six hundred seventy-two dollars ($21,672) per year for 38 years works out to $823,536.

damages, "given the fact that she's able to continue working, doesn't use medication and was able—and based on her testimony and her improvement that's shown in the records. You may disagree with me, as the instructions tell you. It's up to you to decide and there is no formula for it."

The jury returned a verdict for Karthauser. The verdict form was flawed, although the attorneys and the judge did not realize it until after the verdict. The verdict form had a line for past economic damages, a line for future economic damages, and a line for past and future economic damages. There was no line for noneconomic damages. The jury awarded $13,658 in past economic damages and $151,342 in future economic damages. In line three, the jury added the two previous lines together, for a total award of $165,000. Polling showed that the jury was 11 to 1 in favor of the verdict.

Adams filed a motion for new trial or remittitur. As part of her response, Karthauser obtained a declaration from the presiding juror. The declaration said the jury was aware that there was a problem with the verdict form since there was no line for noneconomic damages, and they had simply included them in the award for future economic damages.

Adams had noted the motion before the trial judge, Judge Sullivan. On March 27, 2013, the motion was heard by Cowlitz County Judge Stephen Warning. Adams did not object when the motion was heard by Judge Warning.

At the hearing, Karthauser's attorney explained how the problem with the verdict form arose. He said opposing counsel had prepared the verdict form:

> Judge Sullivan didn't like either one of our verdict forms even though they were pattern instructions. So he cut them down the

8

middle and he put mine on the bottom and Mr. Mitchell's on the top. And *Mr. Mitchell's office, you know, typed it up and someone left out non.*[2] And I suggest your analysis is correct; it doesn't matter what they call it. They have awarded that, and it was 11 to 1 polled verdict.

(Emphasis added.) Adams did not object to this account of how the verdict form was prepared.

Judge Warning denied the motion:

THE COURT: All right. Thank you, Counsel. Ends up being an interesting issue because of that verdict form. You know, it happens. I wish I could say I've not ever been reading instructions and run across or realized we didn't do this. And those are generally harry times at that point.

What we've got here is there is testimony that was before the jury about future economic potential consequences. Palliative medical treatment, diminution in earning capacity. Those were both properly before the jury. Because of the manner of the jury verdict form we have basically a non-differentiated future damages. And that appears how the jury took it.

It includes the damages for pain and suffering, and it seems to me that that's important here, that they're not differentiated. The—any time we give those instructions I always kind of cringe because we ask the jury to perform this—you know, what's basically alchemy, turn pain and suffering into gold. And we tell them, we don't have—we don't have any fixed or something or other way for you to do this; we drop it in your lap and you have to come up with a number. I mean, that's what we tell them.

And so, because of that, the case law is pretty clear that the notion of general damages are uniquely the province of the jury. Here we've got a non-differentiated number, assuming I can consider the foreman's affidavit, that included something economic. But, in either event, we have a non-differentiated number that includes that pain and suffering in it.

The verdict might be large in comparison to the bell curve, but I don't think that I've got anything in front of me that shows it's a result of passion or prejudice, as that is defined, so I will deny the motion.

Adams appeals.

---

[2] Mr. Mitchell was Adams' attorney.

9

MOTION FOR NEW TRIAL OR REMITTITUR

Adams assigns error to the denial of her motion for new trial or remittitur.

We review for abuse of discretion a trial court's denial of a CR 59(a) motion for a new trial. Sommer v. Dep't of Soc. & Health Servs., 104 Wn. App. 160, 170-71, 15 P.3d 664, review denied, 144 Wn.2d 1007 (2001). We review a trial court's denial of a new trial more critically than we do its grant of a new trial because a new trial places the parties where they were before, while a decision denying a new trial concludes their rights. State v. Taylor, 60 Wn.2d 32, 41-42, 371 P.2d 617 (1962).

Denial of a motion for remittitur strengthens the verdict. Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 180, 116 P.3d 381 (2005). When reviewing a trial court's ruling on a motion for remittitur, we strongly presume the jury's verdict is correct. Bunch, 155 Wn.2d at 179. We review a trial court's denial of remittitur for an abuse of discretion. Bunch, 155 Wn.2d at 176. Thus, we will not disturb a jury's damages award "'unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice'" after viewing the evidence in the light most favorable to the nonmoving party. Bunch, 155 Wn.2d at 179, quoting Bingaman v. Grays Harbor Cmty. Hosp., 103 Wn.2d 831, 835, 699 P.2d 1230 (1985). The substantial evidence test asks whether there is sufficient evidence to convince an unprejudiced, thinking mind. Bunch, 155 Wn.2d at 179. The "shocks the conscience" test asks if the award is flagrantly outrageous and extravagant. Bunch, 155 Wn.2d at 179. Passion and

10

prejudice must be unmistakable to affect the jury's award. <u>Bunch</u>, 155 Wn.2d at 179.

*Substantial Evidence*

The error in the verdict form plays no role in Adams' argument. She concedes that the jury's award contains both economic and noneconomic damages. She nevertheless contends the award of $165,000 is extreme and unsupported by substantial evidence:

> The evidence showed that Karthauser sustained soft-tissue injuries only in the subject accident, received healthcare treatment for alleged injuries attributable to that accident for only several months, had not treated for a couple of years prior to the date of trial, and did not lose any time from her physical job as a result of the injuries allegedly sustained in the accident.

Adams' argument is more like an argument to a jury than an argument on the law. The jury was entitled to accept Karthauser's competing version of the facts, which included:

- Testimony of her physical therapist that she would benefit from more physical therapy.
- Past medical bills and records from her physical therapy office showing the cost per visit for both physical therapy and massage therapy.
- Testimony of her family members as to the lingering effects of the accident on her daily activities and pain level.
- Testimony of Karthauser that she stopped treatment because she could no longer afford the debt load associated with continuing physical therapy.
- Testimony of Karthauser that although she continued with her work as a caretaker, she was no longer employed by the State because of her physical deficits and was now paid by the patient privately.
- Testimony of Karthauser that she would be unable to continue caring for her current patient when her son left home because she relied on him to help with heavy lifting postaccident.

11

Adams presented no contrary evidence. Her closing argument suggested that it was unreasonable to believe that Karthauser had continuing pain because she had stopped going to physical therapy and made no claim for pain medication.

Adams claims it is significant that there was no testimony by a physician to support an award of future damages. She makes the same claim to support her argument that the trial court erred in denying her motion for judgment as a matter of law. She claims medical testimony was necessary to establish (1) "the nature and extent of treatment that would be reasonably and necessarily incurred by Karthauser in the future to help her condition" and (2) "restrictions or limitations placed on Karthauser, permanent impairment, disability, or the like, caused by the motor vehicle accident."

A plaintiff can present legally sufficient evidence of future damages without presenting the testimony of a medical doctor. Bitzan v. Parisi, 88 Wn.2d 116, 558 P.2d 775 (1977).

> There is no reason laymen may not testify to their sensory perceptions, the weight of the testimony to be determined by the trier of fact. Physical movement by the injured person can be seen and described by a layman with no prior medical training or skill. Furthermore, an injured person can testify to subjective symptoms of pain and suffering, and to the limitations of his physical movements.
> Proof of pain and suffering as late as at time of trial even though subjective in character will warrant an instruction on future damages. The same is true of proof of disability and lost earnings. The continued existence of these elements of damage at the time of trial permits a reasonable inference that future damage will be sustained. Expert medical testimony to this effect may also be given but it is not essential.

Bitzan, 88 Wn.2d at 121-22 (citations omitted).

12

Once a plaintiff provides sufficient evidence to establish the *fact* of damage, the tortfeasor cannot escape liability because of the difficulty of proving the *amount* of damage. <u>Reefer Queen Co. v. Marine Const. & Design Co.</u>, 73 Wn.2d 774, 781, 440 P.2d 448 (1968). The jury's constitutional role is to answer questions of fact and the amount of damages is a question of fact. <u>Bunch</u>, 155 Wn.2d at 179.

Karthauser established the fact that she was damaged. She presented the testimony of her physical therapist who treated her after her accident, medical and hospital bills from the night of the accident, and her own testimony of continuing pain and physical deficit from the accident. The jury had all it needed to make an award of $165,000, whether that figure includes both noneconomic and economic future damages, or just economic future damages.

The evidence was sufficient to convince an unprejudiced, thinking mind that $165,000 was an appropriate damage award. We conclude that substantial evidence supports the verdict and that $165,000 was not an extreme amount calling for remittitur.

*Taxpayer comment in closing argument*

At the end of Karthauser's closing statement, she appealed to the jurors as taxpayers:

> Because if she doesn't get anything and she continues to deteriorate, us taxpayers are going to be paying for her. Do you want to pay for her?

Adams contends that this argument had no purpose except to inspire passion and prejudice in the jury, leading to an excessive award:

13

> Attorney Crandall's statements during closing argument, essentially threatening the jury, as taxpayers, with having to pay for Karthauser's economic needs for the rest of her life if they did not give her a lot of money, especially in this day of frequent references to, and dissatisfaction with, the "handout society" that many believe has become the United States, and the fear of increasing taxes in economically uncertain times, created significant prejudice against Adams in this case. Statements such as that made by Attorney Crandall, even after the objection is sustained, cannot be undone.

Br. of Appellant at 19.

A finding that a verdict is the result of passion or prejudice can support either a motion for new trial or remittitur. The question to resolve in determining if a new trial is warranted by a remark in argument is whether the remark engendered such a feeling of prejudice as to prevent the litigant from having a fair trial. Aluminum Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 537, 998 P.2d 856 (2000). The misconduct complained of must be prejudicial in the context of the entire record. Aluminum Co. of Am., 140 Wn.2d at 539, citing with approval 12 JAMES WM. MOORE, FEDERAL PRACTICE § 59.13(2)(c)(I)(A) (3d ed. 1999). Remittitur of a jury's award is inappropriate unless the passion and prejudice is "unmistakable." Bingaman, 103 Wn.2d at 836.

In civil cases, where life and liberty are not at issue, the law militates in favor of a standard that more generally upholds trial court decisions. Aluminum Co. of Am., 140 Wn.2d at 539. We agree with Adams that it is improper to suggest to jurors that taxpayers will have to assume the burden of caring for an injured plaintiff if the jury fails to make an award against the defendant. But the remark in question here, when considered in the context of the record as a whole, does not establish the quantum of passion or prejudice required to disturb

a jury's damage award. See State v. Jellovich, 156 Wash. 388, 391, 287 P. 3 (1930) (remark that a defense witness from Oregon would be paid witness fees and mileage from county taxes was "not of sufficient moment to justify a reversal of the case").

The trial court's refusal to order a new trial or remittitur was not error. Likewise, the court did not err in denying Adams' motion for judgment as a matter of law.

## JUDGE FOR POSTTRIAL MOTION

Adams argues that reversible error occurred when Judge Warning, not Judge Sullivan, heard her motion for new trial and remittitur. Citing CR 63(b), she asserts it is "clear that the judge who presided over the trial should similarly preside over all post-trial motions, absent illness, death, or other disability." Adams has waived this argument. Although she noted the motion before Judge Sullivan, she did not object when Judge Warning heard it.

Even if the argument had been properly preserved, it lacks merit. The rule Adams cites allows another judge to step in when an unexpected disability prevents the judge who presided at a trial from finishing the case:

> **Disability of a Judge.** If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

CR 63(b).

Karthauser asserts in her briefing, and Adams does not dispute, that Judge Sullivan had switched courthouses temporarily with Judge Stephen Warning. The exchange had nothing to do with disability. Judge Sullivan had recused himself from a trial in Wahkiakum County, where he was the only judge. CR 63(b) is therefore inapplicable. Adams does not cite authority demonstrating that only the trial judge can hear a posttrial motion.

As the prevailing party, Karthauser is entitled to statutory attorney fees of $200 under RCW 4.84.080.

Affirmed.

Becker, J.

WE CONCUR:

Spearman, C.J.

Leach, J.