IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | Nos. 69920-2-I |
| | ) | 70420-6-I |
| THERESA IBRAHIM GOHAR, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINIONS |
| | ) | |
| SAMIR GOHAR, | ) | |
| | ) | |
| Respondent. | ) | FILED: December 8, 2014 |

SCHINDLER, J. — Theresa Gohar, acting pro se, appeals the "Amended Decree of Dissolution," "Final Parenting Plan," "Final Order of Child Support," and the "Findings of Fact and Conclusions of Law." In the separate linked appeal, Theresa challenges the order of contempt for violating the parenting plan.[1] Because Theresa fails to establish any legal error or abuse of discretion, we affirm.

DISSOLUTION ACTION

In 1999, Samir and Theresa Gohar were married in Massachusetts. Before the marriage, Samir lived in Massachusetts and owned a restaurant and duplex with his

---

[1] We use the parties' first names for purposes of clarity and mean no disrespect by doing so.

brother. Theresa lived in Washington with her parents and worked at a fast food restaurant. After they married, Theresa and Samir lived in Massachusetts. In 2001, Theresa and Samir had a daughter, C.G., and in 2005, a son, M.G.

After the birth of C.G., Theresa sought mental health treatment. Theresa took an antidepressant medication for approximately two years. During this two-year period, Samir described Theresa as having one bad day for every ten good days. Theresa stopped taking the medication. Theresa said the medication did not help her, and she could effectively manage her depression and anxiety by getting out of the house and engaging in activities. According to Samir, after Theresa stopped taking the medication, she had mostly bad days. Samir described her behavior as erratic and said that Theresa often slept until the afternoon.

In 2007, Samir and Theresa moved to the Seattle area to be near Theresa's family. Samir sold the interest in his restaurant business and the duplex to his brother for $285,500.

In 2008, Samir purchased the family home in Lynnwood for $400,000. Samir used $80,000 of proceeds from the sale of his Massachusetts property for the down payment and took out a mortgage in his name only for the balance. That same year, Samir purchased a restaurant in Marysville, Washington. Samir used $200,000 from the proceeds of the sale of his Massachusetts property for the down payment and secured a loan for the balance of the $1,015,000 purchase price for the business and the real property. The restaurant and real property is in Samir's name only. Samir managed the restaurant alone. Theresa never worked in the restaurant and, for the most part, did not work outside the home during the marriage.

2

In September 2011, Samir moved out of the family home. In February 2012, Samir filed a petition for legal separation. The court later granted Samir's motion to convert his legal separation petition to a petition for dissolution of the marriage. Samir initially proposed that the children reside with Theresa the majority of the time. The court entered a temporary order requiring Samir to pay $6,000 per month for maintenance and child support.

After the separation, the children missed a significant amount of school. Samir became concerned about Theresa's mental health, the children's well-being, and Theresa's attempts to sabotage his relationship with the children. Samir requested designation as the primary residential parent until Theresa engaged in mental health treatment.

In July 2012, the trial court appointed guardian ad litem (GAL) Martha Wakenshaw to act in the children's best interests and make recommendations as to the parenting plan. While Theresa was "largely non-cooperative," the GAL was eventually able to interview both parents, 11-year-old C.G., and 6-year-old M.G.

Samir raised concerns with the GAL about Theresa's mental health, the children's school attendance, and their emotional health and physical safety if Theresa insisted on refusing treatment. Samir admitted he developed a gambling addiction in 2011. Samir also said he was attending Gamblers' Anonymous and was being treated for depression.

Theresa told the GAL she wanted "nothing more" than for Samir to "return to the home as her husband and father to the children." Theresa did not allege that Samir was abusive to her or the children, but she felt that Samir neglected the children's feelings.

3

Theresa admitted that she let the children stay home from school when they had a runny nose or stomachache. Theresa would not sign a release to obtain school records or allow the GAL to speak to her treatment providers. Instead, Theresa provided the GAL with a declaration from a therapist who confirmed that Theresa had been diagnosed with depression, anxiety, and obsessive-compulsive disorder but stated there was no evidence to support a diagnosis of paranoia or delusions. The therapist said that although some of Theresa's concerns went beyond the normal level, they were grounded in rational concerns.

GAL Report

The GAL prepared a report in October 2012. The GAL reported that Theresa was "extremely suspicious, guarded, and depressed." The GAL stated that during the home visit, Theresa had almost no interaction with the children, and Theresa and her mother openly discussed the court case in front of the children. The GAL described C.G. as "articulate, anxious, and depressed." C.G. told the GAL that her mother tells her "everything" about court so as not to leave her in the dark, and lets her read the documents. C.G. said she was "mad at dad" after reading court documents containing Samir's allegations about Theresa's mental health issues. The GAL described M.G. as obese and having a "sadness and despondency" about him.

M.G. reported that his mother gets frustrated about "court stuff" and that his mom's judge was "really mean."

Neither child reported abuse by either parent, and C.G. affirmatively denied it. C.G. told the GAL that Samir was the person who helped her with schoolwork, and M.G.

4

said he liked it at Samir's house best. The GAL concluded the children were the victims of abusive use of conflict by the mother.

> Clearly, both [C.G.] and [M.G.] are the victims of an extreme abusive use of conflict on the part of the mother. Both children have stated that she has talked to them about the court case and it was a strong theme in both of their interviews, especially [C.G.]'s interview.

> Both children present as confused, depressed, and anxious and could both benefit from intensive, individual psychotherapy.

> It is unconscionable that the mother has permitted her eleven-year-old daughter to read the court documents and pleadings. The daughter has become so fearful that she was worried that the GAL might take her away from her parents and put her in foster care.

The GAL recommended that the court designate Samir as the primary residential parent, the children stay with Theresa every other weekend and one weekday every week, and Theresa be prohibited from sharing court information with the children. The GAL recommended supervised visitation with the children if Theresa continued to engage in abusive use of conflict. The GAL also recommended that each parent obtain a psychological assessment and individual counselling for the children.

Samir obtained a psychological assessment. The evaluator concluded that Samir was being appropriately treated for his mild depression and his previous gambling addiction, and expressed no concerns about his parenting. The same evaluator contacted Theresa to arrange an evaluation but she did respond.

After the GAL filed her report, Theresa filed a motion to remove the GAL. On October 23, a court commissioner struck Theresa's motion because she had not served the GAL.

Protection Order

On October 24, Theresa went to C.G.'s middle school and told the school counsellor that the previous night, C.G. had disclosed that Samir touched her sexually. Child Protective Services (CPS) and the police initiated an investigation. Theresa filed a petition for a protection order. The court entered a temporary protection order.

On October 26, Theresa took C.G. to the emergency room because of a sore throat but did not mention the sexual abuse allegation. On October 29, Theresa took C.G. to the doctor for a previously scheduled appointment and asked the doctor to examine C.G. for possible injuries stemming from abuse.

On October 30, a commissioner held a hearing on the protection order. Samir, Theresa, and the GAL appeared at the hearing. Theresa told the commissioner that C.G. said, "My dad touch [sic] me down there." Theresa said she was also concerned because some weeks earlier, there was blood on C.G.'s underwear. Theresa admitted she did not immediately take C.G. to the doctor or inform the GAL following the disclosure.

Upon learning that C.G. was in the courthouse, the commissioner asked the GAL to privately interview the child and report back. The GAL told the commissioner it was a stressful interview for C.G. and described "chaos and interference" by Theresa and her family members. At first, Theresa's mother refused to leave the interview room. After she was forced to do so, Theresa and her family members hovered outside the glass window of the interview room, stating loudly that the GAL was a "liar."

C.G. told the GAL that her mother had told her about the GAL's report and that as a result, she might live with her father. C.G. said that while she and her mother were

6

discussing menstruation, her mother asked if her father had ever touched her. C.G. said yes. C.G. said her father touched her twice between the legs, over her clothing, for no more than three seconds. The GAL questioned the validity of the reported abuse because the allegation was vague, contained inconsistencies about timing, and arose from Theresa's suggestive questioning. Noting the lack of evidence about what C.G. reported to others, the suspicious circumstances of the allegations, and the fact that the allegations themselves lacked credibility, the commissioner determined the allegation of sex abuse was not supported by a preponderance of the evidence. The commissioner dismissed the petition to issue a protection order without prejudice to refiling if "more clear-cut information were to arise."

Dissolution Trial

The two-day dissolution trial took place in early November. The court considered the testimony of Theresa, Samir, the GAL, and brief testimony of Theresa's brother-in-law.

Theresa's position at trial was that the children should reside with her and have no visitation or contact with Samir because of the alleged sexual abuse. Theresa testified about C.G.'s disclosure. Theresa also claimed Samir was emotionally abusive to her and to C.G., and for the first time, she mentioned incidents of physical abuse. Theresa disputed many facts in the GAL's report. For instance, Theresa denied discussing the pending dissolution with the children. But Theresa admitted that on occasion, she asked C.G. the meaning of a word that she did not understand in court documents. Theresa also claimed that M.G. had been sexually assaulted when he was three or four. But Theresa admitted that M.G. merely answered yes to a leading

7

question about abuse and she never took the child to the doctor or otherwise reported the incident.

In addition to the information and recommendations in the report, the GAL testified about the recent sexual abuse allegations and recommended that visitation with the children be supervised until Theresa obtained a psychological evaluation.

The court found Theresa "not credible." The court found that Theresa's testimony was deceptive because she often indicated that she was confused and could not remember details to evade questions. The court found that Theresa is "in need of psychological services," and that she "attempted to falsely accuse the father of sexual abuse" in order to discredit the GAL and her recommendations. The court found the GAL was credible and concluded both children were victims of extreme abusive use of conflict by the mother.

The court entered a parenting plan designating Samir as the primary residential parent and imposed limitations on Theresa's contact with the children under RCW 26.09.191(3)(a) ("A parent's neglect or substantial nonperformance of parenting functions;"); (3)(b) ("A long-term emotional or physical impairment, which interferes with the performance of parenting functions as defined in RCW 26.09.004); and (3)(e) ("The abusive use of conflict by the parent, which creates the danger of serious damage to the children's psychological development."). The court ordered visitation with Theresa to be supervised by a designee selected by Samir. The court ordered Theresa to obtain a psychological evaluation within 30 days. The November 30 order provides that upon completion of the evaluation, Theresa may file a motion for unsupervised visitation. The court also ordered that both children should be enrolled in therapy.

8

With respect to the division of assets, the court determined that although Samir contributed separate funds toward the purchase of the family home, it was a community asset. The court ruled the restaurant was a separate asset and awarded it to Samir. The court noted that the debt associated with the business outweighed its value, Theresa had not participated in running the restaurant, and the testimony indicated she was unwilling to assume any debt associated with the business. The court awarded the family home to Samir and awarded the parties' three retirement accounts to Theresa. According to the court's calculation, the value of community assets awarded to Samir was $109,900 and the value of community assets awarded to Theresa was $102,500. The court ordered Samir to pay monthly maintenance to Theresa for two and a half years ($2,500 for six months; $2,000 for six months; $1,500 for six months; $1,000 for six months; and $500 for six months).

In calculating child support, the court found that Samir's monthly gross income was $10,430 and Theresa's income was $2,350. After subtracting deductions, the combined monthly net income was $8,711 and the proportional share of the combined income for Samir and Theresa was 75.3 percent and 24.7 percent. The court calculated Theresa's proportional share of the basic support obligation and health care expenses for both children as $546 per month, but deviated downward to $300 per month because "[t]he mother is not employed at this time and will be living primarily off the maintenance obligation so as to maximize her ability to create a new household."

On February 7, 2013, Theresa filed a notice of appeal challenging entry of the amended decree of dissolution, final parenting plan, order of child support, and findings of fact and conclusions of law.

9

## CONTEMPT ACTION

Samir paid $2,500 toward a psychological evaluation for Theresa, but Theresa did not obtain an evaluation within 30 days as ordered. Theresa did not meet with the psychologist until February 2013. Theresa also did not request visitation with the children until December 2012, over two months after the court entered its order. Samir suggested using three people who offered to supervise for free. Theresa's attorney responded that she preferred to use a professional supervisor. However, Theresa did not follow up to arrange visitation.

In February 2013, Samir learned from the children that Theresa met each of them at the school bus stop. M.G. said his mother told him she was "fighting" for him. Samir's attorney contacted Theresa's attorney about the contact and warned that Samir would be forced to file a motion for contempt if Theresa continued to violate the parenting plan. Theresa's attorney responded that Theresa said the problem was that "Samir isn't allowing her to see the children—at all," and requested that Samir provide suggested names for supervised visitation. Samir's attorney pointed out that Samir had already provided names for supervised visitation and that Theresa rejected the suggested supervisors and decided to hire a professional. Samir later offered to pay for the first supervised visit and split the cost thereafter. Theresa refused the offer. Theresa took the position that she was not required to pay for the costs of supervision.

Samir learned that on March 18 and 19, Theresa contacted the children again at the bus stop. M.G. said his mother told him she had just received the psychological evaluation report, she was not "not sick anymore," and she would be able to see him again in about two weeks. Samir said C.G. came home "angry with him" because her

mother told her the same thing and C.G. demanded to know "the details" about what was happening in court.

Samir filed a motion to show cause why Theresa should not be held in contempt for violating the parenting plan. A court commissioner entered a show cause order that required Theresa to appear in court on April 10. Theresa's attorney accepted service of the contempt motion in exchange for an agreement to continue the hearing until April 25.

Theresa appeared at the contempt hearing on April 25 without an attorney. The court commissioner continued the hearing, in part so Theresa could obtain a court-appointed attorney. The order continuing the hearing directs Theresa to appear at the Office of Public Defense. At Theresa's request, the court revised the order, finding that Theresa was "adamant" that she did not want an attorney and had waived her right to counsel.

Theresa represented herself at the hearing on the contempt motion. Theresa argued that the motion should be dismissed because she was not personally served. Theresa denied visiting her children at the bus stop and pointed to lack of "physical proof." Theresa admitted she had not had any visits with the children as contemplated by the parenting plan but argued it was because Samir and his attorney "refuse to let me see my children."

The commissioner held Theresa in contempt, finding that she was properly served with the contempt motion, violated the parenting plan by having unauthorized contact with the children on more than one occasion, and unreasonably rejected arrangements for supervised visitation. The commissioner also found that Theresa's

11

noncompliance with the parenting plan was in bad faith. The order allows Theresa to purge the contempt by remaining at least 100 yards away from the children's bus stops, home, and schools. The order requires supervised visitation with a professional supervisor at Theresa's expense. The commissioner awarded $1,500 in attorney fees to Samir. A superior court judge denied Theresa's motion for revision. Theresa filed a notice of appeal challenging the contempt order and order denying revision.[2]

Parenting Plan

Theresa primarily challenges the trial court's decision designating Samir as the primary residential parent and the imposition of supervised visitation.

We review a trial court's parenting plan for abuse of discretion. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012), cert. denied, 133 S. Ct. 889 (2013). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Katare, 175 Wn.2d at 35. We defer to the trial court because of its unique opportunity to observe the parties, determine their credibility, and sort out conflicting evidence. In re Marriage of Woffinden, 33 Wn. App. 326, 330, 654 P.2d 1219 (1982). Because of the trial court's unique opportunity to observe the parties, the appellate court should be extremely reluctant to disturb decisions with regard to child placement decisions. In re Parentage of Schroeder, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001).

---

[2] In June 2013, Theresa filed another notice of appeal challenging the October 30, 2012 dismissal of her petition for a protection order to prohibit contact between Samir and C.G. See No. 70594-6-I. A commissioner of this court dismissed the appeal as untimely. Because we previously denied Theresa's motion to modify the commissioner's ruling dismissing review, her arguments related to the protection order are not properly before us.

The best interests of the child is the standard "by which the court determines and allocates the parties' parental responsibilities." RCW 26.09.002; Schroeder, 106 Wn. App. at 349. In establishing a residential schedule for children in a parenting plan, RCW 26.09.187(3) identifies the following factors a trial court must consider:

> (i) The relative strength, nature, and stability of the child's relationship with each parent;
> (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
> (iii) Each parent's past and potential for future performance of parenting functions . . . , including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
> (iv) The emotional needs and developmental level of the child;
> (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
> (vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
> (vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

Theresa's arguments do not reference any of the relevant statutory factors. And contrary to Theresa's apparent belief, there is no presumption in favor of the historic primary caregiver. In re Marriage of Kovacs, 121 Wn.2d 795, 800, 854 P.2d 629 (1993). Rather, the statute requires the court to consider both past and potential future performance of parenting functions.

While restrictions in a parenting plan are mandatory under some circumstances, the court imposed supervised visitation in this case under RCW 26.09.191(3)(g), a discretionary provision that permits a trial court to limit the terms of a parenting plan. Katare, 175 Wn.2d at 36. This discretionary authority is conditioned on the existence of

13

specific factors or conduct that the court expressly finds adverse to the best interests of the child. Katare, 175 Wn.2d at 36.

Theresa contends that the trial court (1) ignored evidence of sexual abuse, (2) made its decision without allowing appropriate state agencies to investigate the abuse allegations, (3) failed to consider Theresa's historic role as the day-to-day caretaker, (4) ignored the fact that Samir abandoned the family, (5) gave undue weight to the opinions and recommendations of the GAL, and (6) disregarded evidence that the children were performing well in school when she was the primary caretaker. Theresa's arguments rely entirely upon her subjective interpretation of the conflicting evidence and reflect a fundamental misunderstanding of the role of the appellate court.

An appellate court may not substitute its evaluation of the evidence for that made by the trier of fact. Goodman v. Boeing Co., 75 Wn. App. 60, 82-83, 877 P.2d 703 (1994), aff'd, 127 Wn.2d 401, 899 P.2d 1265 (1995). If they are supported by substantial evidence, we accept the court's factual findings. In re Marriage of Thomas, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991). Evidence is substantial when there is a sufficient quantum of evidence "to persuade a fair-minded person of the truth of the declared premise." In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). So long as a finding is supported by substantial evidence, it does not matter that other evidence may contradict the finding. Burrill, 113 Wn. App. at 868. This court does not review the trial court's determinations as to the credibility and persuasiveness of the evidence. In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

The record shows that the trial court considered and weighed the evidence in accordance with the factors under RCW 26.09.187(3)(a) and made specific findings of

14

the presence of factors under RCW 26.09.191(3)(a) (substantial nonperformance of parenting functions), (3)(b) (emotional or physical impairment), and (3)(e) (abusive use of conflict) that adversely affected the best interests of C.G. and M.G. The imposition of restrictions is supported by substantial evidence. The evidence showed that Theresa continually involved the children in the legal proceedings, attempted to alienate them from Samir, and made unsubstantiated abuse allegations. There was evidence that the children were adversely affected by Theresa's conduct and were anxious, stressed, fearful, and depressed. Evidence supports the court's findings that Theresa suffered from mental health issues that interfered with her parenting. Specifically, since the parties separated, the mother was sleeping much of the time, allowing the children to miss school, keeping the children up at night, and isolating them. Theresa's insistence upon unsubstantiated sexual abuse allegations with regard to both children also supports the court's finding of mental health impairment that interfered with parenting. The evidence supports the court's decision to limit Theresa's residential time under RCW 26.09.191(3) and order supervised visitation until she completed an evaluation and followed treatment recommendations.

Although Theresa obviously disagrees with the court's decision, the court did not abuse its discretion, and substantial evidence supports the provisions of the parenting plan.

In addition to her argument that the GAL was not credible or persuasive, Theresa also contends the court should not have considered the GAL's report because it was not filed 60 days before trial as required by RCW 26.12.175(1)(b). But nothing in the record suggests that she was prejudiced by the delay. The GAL testified at trial and the report

15

was admitted as evidence without objection. We do not consider arguments raised for the first time on appeal. RAP 2.5(a); Lunsford v. Saberhagen Holdings, Inc., 139 Wn. App. 334, 338, 160 P.3d 1089 (2007).

The record indicates that the court and the parties had access to the report before it was filed on the first day of trial. Although Theresa sought to have the GAL removed from the case, the basis for her request was her claim that the GAL reported false facts and she disagreed with the GAL's recommendations. The court concluded that Theresa's motion to remove the GAL was not properly before the court because she failed to serve the GAL, a fact she does not dispute. Theresa also twice moved to continue the trial but did not mention needing more time to respond to the GAL's report. The court did not err in considering the GAL's report.

Division of Property

Theresa challenges the court's division of property. Theresa claims the court awarded all of the parties' community property to Samir, followed all of Samir's requests with respect to property, and denied all of her requests. Theresa argues the court awarded all the primary assets to Samir including the restaurant, the marital home, and the children's college fund.

The trial court's objective when dividing property is to divide and distribute the parties' property in a manner that is "just and equitable." RCW 26.09.080. The statute requires the trial court to consider

all relevant factors including, but not limited to:
(1) The nature and extent of the community property;
(2) The nature and extent of the separate property;
(3) The duration of the marriage; and

> (4) The economic circumstances of each spouse . . . at the time the division of the property is to become effective . . . .

RCW 26.09.080. A just and equitable distribution does not mean that the court must make an equal distribution. In re Marriage of DewBerry, 115 Wn. App. 351, 366, 62 P.3d 525 (2003).

We review the division of property for abuse of discretion. In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). The trial court has "broad discretion," which will be reversed only if exercised on untenable grounds or for untenable reasons. In re Marriage of Rockwell, 141 Wn. App. 235, 242-43, 170 P.3d 572 (2007). "The trial court is in the best position to assess the assets and liabilities of the parties . . ." and to determine what constitutes an equitable outcome. In re Marriage of Brewer, 137 Wn.2d 756, 769, 976 P.2d 102 (1999).

Theresa disregards some critical facts. In arguing that the court awarded all the property to Samir, Theresa fails to acknowledge that the court awarded all of the retirement savings to her. The value of the retirement accounts was $87,000 and is nearly equal to the equity in the parties' home of $92,000. The difference in value in the property awarded to Samir and the property awarded to Theresa was approximately $7,000. And as the court pointed out, despite the slight discrepancy in favor of Samir, the distribution was equitable in light of the prior distribution of $15,000 in community assets to Theresa for legal expenses and Samir's payment of $6,000 per month in temporary maintenance and child support during the pendency of the proceedings.

While the court's division of property does not include Samir's restaurant nor account for the stream of income it provides, there is no dispute that Samir used

separate property to purchase the business and the evidence showed that the debts associated with the restaurant outweighed its value. The court found that the net value of the restaurant was negative $21,000. Theresa's claim that the court awarded property of over $1 million in assets to Samir is apparently based on the purchase price of the restaurant, $1,015,000, without adjustment for the substantial mortgage debt and the current value of the real property.

Theresa also contends that the court erred in relying on valuations of property prepared by Samir or his nonprofessional acquaintances. But the record shows there were two expert valuations of the restaurant, and the trial court used the valuation figure assigned by Theresa's expert. And while the court did assign value to the parties' home based on a market analysis submitted by Samir and prepared by a real estate broker, Theresa fails to explain why the broker was unqualified to render an opinion about the likely sales price of the home. There was no other evidence of the current value of the home before the court. The trial court did not abuse its discretion by assigning values to property within the scope of the evidence. See In re Marriage of Soriano, 31 Wn. App. 432, 435, 643 P.2d 450 (1982).

Further, it is not true, as Theresa suggests, that the trial court adopted all of Samir's requests for distribution of property. The court rejected Samir's request that the award reflect his contribution of separate funds toward the purchase of the family home. And contrary to Samir's request, the court awarded the two retirement accounts in Samir's name to Theresa.

Child Support and Maintenance

Theresa argues the trial court did not award sufficient maintenance to allow her maintain the lifestyle she had before the dissolution. Theresa also contends that for purposes of determining maintenance and child support, the court erred in calculating Samir's income by not using the income figure listed on the 2011 tax return. Theresa also asserts the court erroneously imputed an "amplified" income to her and appears to argue that the court erred in ordering her to pay child support because by doing so, the court effectively reduced her maintenance.

The purpose of spousal maintenance is to help support a spouse until he or she is able to become self-supporting. In re Marriage of Irwin, 64 Wn. App. 38, 55, 822 P.2d 797 (1992); In re Marriage of Luckey, 73 Wn. App. 201, 209, 868 P.2d 189 (1994). Under RCW 26.09.090(1), the trial court may award maintenance to either spouse in an amount and for a duration deemed just, considering six nonexclusive factors: (1) the respective financial resources and ability to independently meet needs; (2) the length of the marriage; (3) the time necessary for the spouse receiving maintenance to acquire employment-related education or training; (4) the standard of living established during the marriage; (5) the age, health, and financial obligations of the spouse receiving maintenance; and (6) the ability of the spouse paying maintenance to support himself or herself as well as the spouse receiving maintenance. We review a spousal maintenance award for abuse of discretion. In re Marriage of Washburn, 101 Wn.2d 168, 179, 677 P.2d 152 (1984).

The court's calculation of Samir's income is supported by the testimony and evidence at trial, including documentation of the business revenue and expenses.

19

Although Theresa claims the court should have calculated the monthly income based on the annual income figure listed on the 2011 joint tax return, the evidence shows this figure includes sizable gambling winnings that were later treated as a deduction and also includes money transferred by the business to Samir to pay the mortgage on the real property where the restaurant is located. The record supports the income figures used by the court for both parties, and the court did not abuse its discretion in determining the amount of maintenance.

With respect to child support, parents have a legal obligation to support their children. RCW 26.19.001; Childers v. Childers, 89 Wn.2d 592, 599, 575 P.2d 201 (1978). The child support obligation "should be equitably apportioned between the parents." RCW 26.19.001.

While, in appropriate circumstances, a trial court may grant a deviation from the standard child support calculation under RCW 26.19.075, a deviation is an "exception to the rule and should be used only when it would be inequitable to do otherwise." In re Marriage of Oakes, 71 Wn. App. 646, 652 n.4, 861 P.2d 1065 (1993). A decision regarding a deviation is within a trial court's sound discretion and "will seldom" be disturbed on appeal. In re Marriage of Booth, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). Here, the trial court exercised its discretion to deviate downward, recognizing that maintenance was Theresa's sole source of income. However, the court was not required to deviate, much less required to deviate to a zero transfer payment.

Continuance of the Trial

Theresa contends that the court abused its discretion in denying her two motions to continue the trial. According to Theresa, the court's denial was based on the

20

erroneous belief that the GAL report had been filed on time. But Theresa's motions did not mention the timing of the GAL report, and again, Theresa fails to explain how she was prejudiced by the delay in filing the report. The court did not abuse its discretion in determining that it was not in the children's best interests to delay the trial. See Lewis v. Bell, 45 Wn. App. 192, 196, 724 P.2d 425 (1986) (this court will not disturb a decision denying a continuance absent manifest abuse of discretion).

Motion for a New Trial

After the trial, Theresa hired another attorney, the fifth attorney to represent her in these proceedings, and filed a CR 59 motion for a new trial or reconsideration. The court granted the motion in part, agreeing that maintenance should be subject to modification, but otherwise denied the motion. On appeal, Theresa reiterates the same arguments she raised below. But as the trial court ruled, Theresa's claim of "irregularity" based on her trial counsel's representation is unavailing. CR 59(a)(1); Nicholson v. Rushen, 767 F.2d 1426 (9th Cir.1985) (plaintiff in a civil case generally has no right to effective assistance of counsel). In any event, we disagree that her attorney's performance deprived the trial court of sufficient information to render a decision. Both parties presented evidence and effectively utilized cross-examination. The court acted well within its discretion in denying Theresa's motion. See Sommer v. Dep't of Soc. & Health Servs., 104 Wn. App. 160, 170–71, 15 P.3d 664 (2001) (appellate court reviews denial of CR 59 motion for abuse of discretion).

We affirm the Amended Decree of Dissolution, Final Parenting Plan, Findings of Fact and Conclusions of Law, and Order of Child Support.

21

Contempt Order

In her linked appeal, No. 70420-6-I, Theresa claims the court erred in holding her in contempt based on "false claims" and the evidence does not support the trial court's findings that she had unsupervised contact with her children and unreasonably refused to engage in visitation with them. Theresa also challenges the award of attorney fees to Samir.

In the context of compliance with a parenting plan, contempt is governed by RCW 26.09.160. Under RCW 26.09.160(2)(b), a court "shall find" a party in contempt if, after a hearing, the court enters a written finding "that the parent, in bad faith, has not complied with the order establishing residential provisions for the child . . . ." In re Marriage of James, 79 Wn. App. 436, 440, 903 P.2d 470 (1995).

We review a trial court's decision in a contempt proceeding for abuse of discretion. James, 79 Wn. App. at 440. A court's decision is manifestly unreasonable if it is outside the range of acceptable choices given the facts and the applicable legal standard and it is based on untenable grounds if the factual findings are unsupported by the record. In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). When, as here, an appeal is taken from an order denying revision of a court commissioner's decision, we review the superior court's decision, not the commissioner's. In re Marriage of Williams, 156 Wn. App. 22, 27, 232 P.3d 573 (2010).

Samir submitted a declaration in support of the motion for contempt. In it, Samir states that in February 2013 and several weeks later in March 2013, both children reported that their mother contacted them at the bus stop and talked to them about the court case. While Theresa denied the contact at the contempt hearing, the court was

not required to believe her in light of the conflicting evidence and her attorney's implicit acknowledgement that she had visited the children but had a legitimate reason to do so. Theresa also claims the court ignored evidence of her good faith efforts to exercise supervised visitation and evidence that Samir rejected all her attempts to arrange visits with them. But to the contrary, the evidence shows that Samir and his attorney made significant efforts to facilitate Theresa's supervised visitation in accordance with the parenting plan. Theresa, on the other hand, rejected the visitation supervisors Samir suggested, objected to proposed locations, refused Samir's offer to share the cost of a professional supervisor, and even rejected his offer to pay the full cost for the initial supervised visit.

Theresa provides no authority that supports her argument that Samir was required to personally serve her with the motion for contempt even though the attorney representing her accepted service. It appears that Theresa was unhappy when she learned that her attorney accepted service of the motion in exchange for a continuance of the contempt hearing. However, she does not dispute the fact that the attorney was representing her in this matter or argue that the scope of the representation did not include the authority to accept service.

Theresa argues that the amount awarded to Samir for attorney fees was unreasonable because Samir was ordered to pay attorney fees of only $1,000 in a previous finding of contempt prior to the dissolution. RCW 26.09.160 (2)(b)(ii) provides that upon finding a parent in contempt, the court "shall" order that parent to pay "all court costs and reasonable attorney fees" incurred as a result of the noncompliance to the moving party. No evidence shows that the two different findings of contempt

resulted in the same amount of fees and costs, nor is there any evidence to support her claim of bias. The superior court did not abuse its discretion in denying Theresa's motion to revise the commissioner's order of contempt and award of attorney fees.

In sum, we affirm the amended decree of dissolution, final parenting plan, findings of fact and conclusions of law, and child support order. We also affirm the order of contempt and the award attorney fees to Samir under RCW 26.09.160 in the linked appeal. Subject to compliance with RAP 18.1, we grant Samir's request for attorney fees on appeal under RCW 26.09.160 and RCW 7.21.030, See In re Marriage of Rideout, 150 Wn.2d 337, 359, 77 P.3d 1174 (2003) ("[A] party is entitled to an award of attorney fees on appeal to the extent the fees relate to the issue of contempt.").

WE CONCUR:

24