[No. 45842-6-I. Division One. January 8, 2001.]

LAURENCE D. SOMMER, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Abraham A. Arditi*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Gregory Jackson, Assistant*, for respondent.

WEBSTER, J. — Laurence Sommer appeals the entry of judgment on a jury verdict for his employer, the Department of Social and Health Services (DSHS), in his suit against DSHS for disability discrimination. Sommer argues that a new trial is warranted because of opposing counsel's misconduct during closing arguments, and because the verdict was unsupported by substantial evidence. Because the verdict was not supported by substantial evidence, we reverse and remand for a new trial on the issue of damages only.

## FACTS

Laurence Sommer worked for DSHS, in various locations, during 1983-84, 1987-91, and since 1994. In June 1995, Sommer began working at DSHS' Kennewick Community Service Office (CSO) as a financial services specialist 3 (FSS 3). His duties involved interviewing welfare applicants and determining their eligibility for benefits.

Sommer had first been diagnosed with recurrent depression and panic disorder in 1985. He had been treated intermittently since 1985 and was hospitalized at the University of Washington Medical Center for depression in 1990. When Sommer started working at the Kennewick CSO, he notified his supervisor, Lenore Johns, about his earlier problems with depression.

While working at Kennewick, he began to experience a recurrence of his depression. On April 22, 1996, Sommer wrote to Lenore Johns, stating that "[t]he stress of the current situation in our unit is a very unhealthy situation and is potentially very hazardous to my health," and requesting a reassignment "so as to not cause myself

permanent psychological and physical damage." Sommer's condition worsened, and he had a breakdown on April 28.

Sommer saw Dr. Dunner on April 29, and was prescribed an antidepressant. Sommer asked Johns for a lighter workload, but she declined, saying she didn't want him at work until he was 100 percent. On May 1, Sommer wrote another letter to Johns, relating that he had seen Dr. Dunner, describing his symptoms, and stating that his condition was being aggravated or possibly caused by workplace stress. Sommer then went on sick leave.

Sommer also saw Dr. Wendy Raskind, the doctor who initially diagnosed him and had been intermittently treating him for recurring depression and panic disorder since 1985. On September 23, Dr. Raskind wrote two letters to Johns. Both stated that it was her opinion that a job transfer to a lower stress position would be in the best interests of Sommer's health.

On September 27, Johns responded to Dr. Raskind by sending her forms which asked about, inter alia, Sommer's ability to lift, bend, squat, and carry. At trial, Dr. Raskind testified that because her previous letters to Johns supplied the remaining information sought in the forms, Dr. Raskind did not fill them out. On October 8, Dr. Raskind certified Sommer's need for leave "until [he] can be reassigned to a less stressful job position or his responsibilities curtailed."

On November 8, Johns sent the same forms to Dr. Dunner that she had sent to Dr. Raskind. On November 15, Dr. Dunner wrote to Johns, indicating that he had "a good deal of difficulty identifying what stresses are involved in jobs not knowing exactly the situation involved . . . ." Dr. Dunner released Sommer to return to the FSS 3 position without job restrictions, but the release was contingent on a work site evaluation. A work site evaluation was never performed, and DSHS did not supply Dr. Dunner with the information he had requested about Sommer's job conditions.

On November 21, Johns wrote to Sommer, directing him to return to work on November 26. Sommer did not return,

and Johns placed him on "unauthorized leave without pay."

On December 2 and December 4, Sommer wrote to Johns, asking her to consider reassigning him. On December 5, he wrote Luisa Torres, the administrator of the Kennewick office, requesting "reasonable accommodation" and indicating that reassignment to a less stressful position would be "the prudent course of action." Sommer faxed this letter to Carol Randolph, DSHS's human resources manager for Region 2, and Jesse Torres, DSHS's affirmative action officer for Region 2.

On December 15, 1996, DSHS offered Sommer a temporary appointment as a clerk in the Pasco CSO. The position involved reception work, much of it dealing with angry clients. Sommer's symptoms worsened, and Sommer renewed his treatment with Dr. Peskind. On March 9, 1997, Sommer wrote to Stella Vasquez, DSHS's administrator for Region 2, and invited her to discuss his situation with Dr. Peskind or Dr. Raskind. Vasquez never contacted them. On March 25, DSHS notified Sommer that his temporary appointment in Pasco would end on March 31, and directed him to return to his FSS 3 job in Kennewick effective April 1. On March 26, Sommer wrote Vasquez, "As you are aware of my medical condition I am unable to report as directed to the Kennewick CSO . . . to resume duties as a financial services specialist." On March 31, he wrote to Luisa Torres, asking her to send him any forms she needed Dr. Peskind to complete. On April 2, Lenore Johns sent Dr. Peskind the same forms that she had sent Dr. Dunner and Dr. Raskind.

On April 11, Dr. Peskind faxed the completed forms to DSHS. On the forms, he indicated that Sommer could not return to work, with or without restrictions. In response to the question, "What is the diagnosis and prognosis?" he responded, "Major depressive disorder, Recurrent, Severe . . . [with] suicidal ideation and agitation . . . . Currently unable to tolerate the pressure and expectations of position #MD11 [FSS 3] (function #4)."

Dr. Peskind indicated that Sommer had the psychological limitations of major depressive disorder that interfered

with his ability to perform the functions of the FSS 3 position. Dr. Peskind further commented that Sommer was "currently feeling psychologically brittle & reactive to stress and pressure, with some suicidal thoughts (this is a serious concern)." Dr. Peskind recommended 30 days away from work, with a reevaluation following the end of that period.

On May 27, Sommer wrote Johns:

I saw my Dr. [Friday] 5/23/97 and he said he had not heard from you since early 4/97. It is my doctors [sic] recommendation that I not return to work as an FSS 3 but request reasonable accommodation. I am requesting reassignment to a social worker or customer service specialist. Additionally I am requesting to be placed in an office in the greater Puget Sound area so as to have immediate access to my doctor should a medical emergency occur.

On June 10, Johns wrote back, "we are honoring your request for an administrative demotion. We will demote you to a Clerk 3 position in Reception here in the Kennewick CSO."

On June 13, Dr. Peskind wrote Johns,

Larry showed me your letter to him dated June 10, 1997. He also showed me his letter to you dated May 27, 1997, in which he requested a transfer to a Social Worker or Customer Service Specialist position in a Puget Sound area CSO. It appears you did not respond to his requests in your letter. Larry has a serious condition involving both depression and anxiety, and Dr. Raskind, his internist, and I have been working closely to help him improve. It would be therapeutic for him if his requests were granted (as required by the Americans with Disabilities Act) and extremely countertherapeutic for him to continue work at the Kennewick CSO. Therefore, after consultation with Dr. Raskind, I am not releasing him to work at the Kennewick CSO in the position of Clerk 3 (which he did not request) or, at this time, in any other position outside of the Puget Sound region.

Dr. Peskind added,

I would hope that you would help Larry in his request for the

reasonable accommodations he is requesting. He is highly motivated to return to gainful employment, and return to work with his requested accommodations would be highly therapeutic for him.

Torres forwarded Dr. Peskind's letter to Vasquez, commenting, "We don't have anything saying Larry needs accommodations." On June 18, Torres wrote to Dr. Peskind, asserting that Vasquez could not assist Sommers in finding a position in the Puget Sound area and that DSHS had no medical information on file that showed that Sommer could not work.

The same day, Torres wrote to Sommer, enclosing a copy of the letter she sent to Dr. Peskind, and directing him to report to work in the Kennewick CSO immediately. Sommer did not report to work. On July 22, Vasquez wrote to Sommer, directing him to return to work on July 28, 1997, and threatening that a failure to report to work would be considered insubordination.

In response, Sommer called Vasquez and requested that she wait to determine a return to work date until he met with Dr. Peskind on July 30. She agreed, but wrote to Sommer on July 25, "we do not have any restrictions from any of your doctors stating that you cannot perform the essential functions of your position."

Sommer replied via fax on July 31:

Dr. Peskind's letter to Lenore Johns dated 6/13/ details my medical condition, my requests for "reasonable accommodations", and the conditions under which he will release me to work.

Sommer invited Vasquez to call Dr. Peskind if she needed any more information.

On August 21, Vasquez wrote to Dr. Peskind, requesting that he identify restrictions that prevented Sommer from performing the "essential functions" of the FSS 3 position. Dr. Peskind did not reply, because he had already informed Johns, in the forms that he had returned on April 11, that the restrictions on Sommer were psychological only, that

Sommer was "unable to tolerate the pressure and expectations" of the position, and that the "psychological limitations of major depressive disorder interfere[d] with his ability to perform" the functions of the position.

Sommer then retained an attorney, who wrote Johns about Sommer's requests for accommodation on October 7, 1997. Vasquez replied on October 29, "We have tried unsuccessfully to obtain specific medical restrictions, which may require a reasonable accommodation, from Mr. Sommer's mental health provider." She enclosed a reasonable accommodation request form. In consultation with Dr. Peskind, Sommer completed and returned the form on November 20. On the form, Sommer indicated that he was unable to perform aspects of three "essential functions" of the position without accommodation.[1] Sommer further stated:

> I have been diagnosed and am being treated for major depressive disorder and generalized anxiety disorder. As a result of these conditions, I have experienced extreme difficulty with some of the listed elements of the financial service specialist III job. Specifically, I have been decompensating in reaction to high pressure, working with people (both clients and co-workers) who are angry and upset, and numerous disruptions.

Sommer again requested a transfer to a CSO in the Puget Sound area, in order to be near his doctors. He commented, "If I were transferred to the Puget Sound area, I might also be able to cope with the essential elements of the financial service specialist job without decompensating."

On December 3, Dr. Peskind submitted a certificate supporting a shared leave request, indicating that Sommer

---

[1] The "essential functions" Sommer indicated he could not perform were:

4. Work in a fast paced, high pressure office with a large amount of work that must be done quickly with tight deadlines.

5. Be responsible for meeting many kinds of people, answering their questions clearly and correctly, help resolve their problems, and promote a good public image of the department. Work with people that are worried, angry, upset, or hard to talk with.

6. Produce high volume's [sic] of work accurately and timely in a fast paced setting with numerous disruptions.

had a "serious or extreme and/or life threatening" mental condition which would continue for "2 months, or until he is in a work environment that is less stressful and geographically closer to his treatment providers."

On December 9, Stella Vasquez again wrote to Sommer's attorney, requesting that Sommer obtain from his doctor "specific restrictions" that would prevent Sommer from performing the essential functions of the FSS 3 position. Sommer's lawyer replied on December 22, summarizing the previous statements of Sommer's health care providers and including photocopies of the statements. Sommer's lawyer offered to provide more information, asked Vasquez to let him know what was missing, and suggested that she participate in a conference call with Dr. Peskind and himself.

In response to this letter, Vasquez scheduled an independent medical exam for Sommer with Dr. Brian L. Grant. This lawsuit was commenced on February 26, 1998. In the agency's answer to Sommer's complaint, it admitted that Sommer and his health care providers had requested that he be assigned to a less stressful position since September, 1996.

Dr. Grant evaluated Sommer on March 12, 1998, and concluded that Sommer's panic disorder precluded him from doing the FSS 3 job.

On April 2, Vasquez wrote to Sommer and indicated that the accommodation process would proceed. On June 3, 1998, as a reasonable accommodation, Vasquez transferred Sommer to a customer services specialist 2 position in the King County CSO in Kent.

Over the course of a three-week trial, Sommers argued that between April 11, 1996, and June 18, 1998, DSHS failed to reasonably accommodate his disability by failing to transfer him to a lower stress job, transferring him to a job in the Puget Sound area, or modifying his job as a financial service specialist 3.

At trial, Sommer presented evidence that during the

two-year period, DSHS had job openings that he was qualified for, but that DSHS failed to affirmatively act to assist Sommer in locating them. He presented evidence that DSHS had openings for customer service specialist 1, 2, and 3, social worker 1 and 2, medical claims examiner 1, community worker, and support enforcement officer 1 positions during the two-year period. DSHS did not refute this evidence.

On October 20, 1999, the jury returned with a verdict for DSHS. Sommers made a motion for a new trial, which was denied. This timely appeal followed.

## DISCUSSION

### Standard of Review

■ Abuse of discretion is the standard of review for an order denying a motion for a new trial: "An order denying a new trial will not be reversed except for abuse of discretion. The criterion for testing abuse of discretion is: '[H]as such a feeling of prejudice been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial?' " *Moore v. Smith*, 89 Wn.2d 932, 942, 578 P.2d 26 (1978) (alteration in original) (quoting *Slattery v. City of Seattle*, 169 Wash. 144, 148, 13 P.2d 464 (1932)). This rule of abuse of discretion specific to motions for a new trial stands in juxtaposition to the general test for abuse of discretion set forth in *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971): "that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons."

The grounds for granting a new trial are set forth at CR 59(a). Sommer relies on two of the nine listed grounds, CR 59(a)(2), and CR 59(a)(7).

### New Trial — Misconduct

■ CR 59(a)(2) permits a new trial because of "[m]isconduct of a prevailing party." Improper closing argument is

one such type of misconduct. 14 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE: TRIAL PRACTICE, § 327, at 658 (5th ed. 1996). Such misconduct must "materially affect[ ] the substantial rights" of the moving party. CR 59(a).

■ However, absent an objection to counsel's remarks, the issue of misconduct cannot be raised for the first time in a motion for a new trial unless the misconduct is so flagrant that no instruction could have cured the prejudicial effect. *Warren v. Hart*, 71 Wn.2d 512, 518-19, 429 P.2d 873 (1967). In this case, no contemporaneous objections were made.

■ Sommer contends that DSHS's counsel engaged in flagrant misconduct by attacking his counsel during closing argument. Counsel for DSHS argued that Sommer's counsel did not cooperate in the accommodation process, rhetorically asking, "was he looking to help his client or line his pockets?" Counsel also argued that Sommer's counsel may have refused to supply information to DSHS so as to help Sommer "line his pockets," and may have instructed Dr. Peskind to withhold information from DSHS.

These statements are not of the sort generally recognized as flagrant misconduct. While they do call into question the motives of counsel, they are not severe personal attacks with no relevance to any issue in the case. Throughout the case, DSHS argued that it lacked notice of Sommer's disability and that Sommer did not cooperate in the accommodation process. The statements made in closing were relevant to those arguments, and were not direct personal attacks on counsel, as were held to be prejudicial in the cases from foreign jurisdictions cited by Sommer. *See Circle Y v. Blevins*, 826 S.W.2d 753, 758 (Tex. Ct. App. 1992); *Paulsen v. Gateway Transp., Inc.*, 114 Ill. App. 2d 241, 252 N.E.2d 406, 409 (1969). Nor were the statements likely to confuse the jury, as were the statements in *Warren v. Hart*, 71 Wn.2d 512, and *Riley v. Department of Labor & Industries*, 51 Wn.2d 438, 319 P.2d 549 (1957). Because the statements did not constitute flagrant misconduct, the trial court did not abuse its discretion in denying Sommer a new trial on this basis.

## New Trial — Verdict Contrary to the Evidence

■■ CR 59(a)(7) permits a new trial when "there is no evidence or reasonable inference from the evidence to justify the verdict." It is an abuse of discretion to deny a motion for a new trial where the verdict is contrary to the evidence. *Palmer v. Jensen*, 132 Wn.2d 193, 198, 937 P.2d 597 (1997). When the proponent of a new trial argues that the verdict was not based on the evidence, the appellate court reviews the record to determine whether there was sufficient evidence to support the verdict. *Palmer*, 132 Wn.2d at 197-98. All evidence must be viewed in the light most favorable to the party against whom the motion is made. *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980). There must be "substantial evidence" as distinguished from a "mere scintilla" of evidence, to support the verdict—i.e., evidence of a character "which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed." *Id.* A verdict cannot be founded on mere theory or speculation. *Id. Accord Campbell v. ITE Imperial Corp.*, 107 Wn.2d 807, 817-18, 733 P.2d 969 (1987).

■ Under Washington's Law Against Discrimination, in order to establish a prima facie case of disability discrimination, the plaintiff must demonstrate: (1) the existence of a disability,[2] and (2) discrimination by the employer because of that disability. RCW 49.60.180(2).

■ The "discrimination" element of disability discrimination is met if the employee demonstrates that the employer took action against the employee because of his or her condition (disparate treatment) or failed to take steps reasonably necessary to accommodate the employee's dis-

---

[2] Substantial and uncontradicted evidence was produced at trial to show that Sommer had a disability under chapter 49.60 RCW. Chapter 49.60 RCW protects individuals with a sensory, mental, or physical disability. RCW 49.60.180(2). At trial, Dr. Peskind and Dr. Raskind both testified that Sommer suffered from recurrent depression and panic disorder. Dr. Dunner testified that Sommer suffered from major depression, recurrent, of moderate severity, and Dr. Grant testified that Sommer suffered from panic disorder and possible major depression.

ability (failure to accommodate). *Doe v. Boeing Co.*, 121 Wn.2d 8, 17, 846 P.2d 531 (1993). Employers have an affirmative obligation to reasonably accommodate the disability unless the employer can demonstrate that the accommodation would cause undue hardship to the employer's business. *Martini v. Boeing Co.*, 88 Wn. App. 442, 451, 945 P.2d 248 (1997), *aff'd*, 137 Wn.2d 357, 971 P.2d 45 (1999).

The plaintiff bears the burden of proving that the employer had notice of the disability. *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 671-72, 880 P.2d 988 (1994); *Goodman v. Boeing Co.*, 127 Wn.2d 401, 408, 899 P.2d 1265 (1995). In order to satisfy the "notice" element, an employee is not required to tell the employer about the full nature and extent of the disability, only that a disability requiring accommodation exists. *Stevens v. City of Centralia*, 86 Wn. App. 145, 156, 936 P.2d 1141, *review granted*, 133 Wn.2d 1001 (1997) (citing *Goodman*, 127 Wn.2d at 408). "Once the employee has met his or her burden of providing the employer with notice of the disability, the employer is required to take 'positive steps' to accommodate the disability." *Martini*, 88 Wn. App. at 457 (citing *Goodman*, 127 Wn.2d at 408). "As long as the employer is on notice that an employee suffers from a serious medical condition, it may be liable under the handicap discrimination law." *Hume*, 124 Wn.2d at 671.

 The *Dean* case[3] illustrates the employer's affirmative duty to accommodate an employee's disability by *affirmatively assisting* the disabled employee in finding another position within the organization, if necessary. In *Dean*, the Supreme Court suggested that Metro failed to meet this requirement because it

> treated [Dean] as any other job applicant, did not determine the extent of his disability, did not call him into the office to assist him in applying in other positions but left the initiative to him. He received no special attention from the personnel

---

[3] *Dean v. Municipality of Metro. Seattle*, 104 Wn.2d 627, 708 P.2d 393 (1985).

office when he tried to find another position within Metro. In addition, Metro acknowledged having job openings that Dean could not have discovered on his own. Metro personnel made themselves available to Dean but took no affirmative steps to help him find another position. This was required of them as "reasonable accommodation".

*Dean* at 639.

In the present case, Sommer presented substantial evidence that he had a disability and notified DSHS of his disability, but that DSHS took *no affirmative steps* to accommodate his disability for over two years. DSHS maintained that it lacked notice of the disability, but this is not supported by substantial evidence and is actually against the weight of the evidence. DSHS also maintained that Sommer failed to cooperate in the accommodation process, but the evidence actually shows that DSHS engaged in a long-term pattern of inaction, stalling, and administrative avoidance.

First, there is not substantial evidence in the record to show that DSHS lacked notice of Sommer's disability. Sommer produced evidence that he repeatedly notified DSHS of his depression and panic disorder, and that he repeatedly requested accommodation.

DSHS did not dispute this evidence. Rather, it contended that Sommer's failure to supply specific medical restrictions to DSHS resulted in DSHS lacking notice of his disability. This is not supported by substantial evidence. When DSHS requested that Sommer supply specific medical restrictions on December 9, 1997, Sommer's lawyer responded with a summary of all the information Sommer had provided DSHS over the past 20 months. This information proved to be sufficient for DSHS to begin to accommodate Sommer, considering that the agency responded to the letter by scheduling an independent medical evaluation.

Moreover, as a matter of law, this is not substantial evidence that DSHS lacked notice of Sommer's disability. Sommer notified DSHS that he had a disability requiring accommodation in April 1996. Because DSHS had the

simple notice required under *Stevens*, *Hume* and *Goodman*, the agency then had a duty to take "positive steps" to accommodate his disability. *See Martini v. Boeing*, 88 Wn. App. at 457.

Second, there is not substantial evidence in the record to show that DSHS took positive steps to accommodate Sommer's disability. DSHS conceded that the agency failed to make an accommodation from April 22, 1996 to June 16, 1999. DSHS argued, however, that Sommer failed to cooperate in the accommodation process. "Reasonable accommodation," the Supreme Court held in *Goodman*, "envisions an exchange between employer and employee where each seeks and shares information." *Goodman*, 127 Wn.2d at 408.

Even taking the evidence in the light most favorable to DSHS, the substantial evidence in the record is that Sommer, rather than DSHS, affirmatively acted to cooperate and share information. The record shows that DSHS uniformly responded to Sommer's requests for accommodation with irrelevant queries about his physical abilities or with requests for information already provided by Sommer's doctors. The record shows that Sommer responded to these requests appropriately, often with invitations to DSHS to speak with his doctors personally. There is not substantial evidence that Sommer failed to cooperate with DSHS, and there is not substantial evidence that DSHS made "positive steps" to accommodate Sommer's disability. Rather, the substantial evidence shows that DSHS took no positive steps to accommodate Sommer until he retained an attorney.

Sommer presented a prima facie case of disability discrimination. DSHS did not argue that accommodating his disability would cause undue hardship. Because the verdict was not supported by substantial evidence, we reverse and remand this case for a new trial on the issue of damages only.

BAKER and KENNEDY, JJ., concur.

Review denied at 144 Wn.2d 1007 (2001).