IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY, of Washington,<br><br>Plaintiff,<br><br>v.<br><br>LEXMAR HOSPITALITY II, LLC,<br><br>Respondent,<br><br>CHE INVESTMENTS LLC,<br><br>Appellant. | No. 84231-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Che Investments seeks the return of its earnest money after not completing the purchase of a hotel from Lexmar Hospitality. After a jury verdict in Lexmar's favor, Che appeals, arguing the trial court should have determined as a matter of law that the parties did not have a valid purchase and sale contract, but rather only an "agreement to agree." Che also argues that if there was a contract, it had a legal excuse not to complete the purchase because Lexmar did not perform its duty to draft financing terms. We decline to engage in post-trial review of the trial court's denial of Che's summary judgment motion, as there were triable issues of fact. Because we determine that substantial evidence supports the jury's verdict awarding the earnest money to Lexmar, we affirm.

FACTS

Che Investments LLC (Che), owned by Unshik James Che and MiRan Che, successfully operated hotels in Alaska and Washington. Che[1] used "1031 exchanges," named for a provision in the tax code, 26 U.S.C. § 1031, to defer federal capital gains for like-kind transactions of investment property each time it sold a property. In summer 2018, Che sought to purchase a hotel by September 11, 2018, so it could preserve the tax benefit of a series of 1031 exchanges. Che would owe deferred taxes of close to a million dollars unless it purchased a new property before the deadline.

To meet the deadline, seller financing would be essential because bank financing would take too long to arrange. Che's commercial real estate broker, Steve Paek, found a hotel in Dupont, Washington, the Home2 Suites, that was not on the market but whose owner, Lexmar Hospitality, was nevertheless willing to sell and would provide seller financing.

On August 6, 2018, Che made an offer using a Commercial Brokers Association (CBA) form purchase and sale agreement (PSA). Two days later, on August 8, Lexmar counteroffered by making strikeouts and additions to the PSA. Che initialed each change that same day.

The PSA included a CBA form financing addendum that explicitly stated it was "part of the Purchase and Sale Agreement" and listed three options for financing: New Financing, Assumption of Existing Financing, and Seller

---

[1] We refer to James and MiRan Che by their first names and use Che to refer to their LLC.

Financing. The parties checked the box for Seller Financing, and both initialed the following modification:

> a. **Debt Instruments.** If Seller is financing a portion of the purchase price, Buyer shall execute and submit to Closing Agent the loan agreement, promissory note, deed of trust, personal guaranty, and any other commercially reasonable documents required by Seller and Anchor Bank.

Under the Seller Financing subsection for "Payment Terms," the box "other" was selected, and the text "See line number 5 Additional Provisions and also attached Addendum" was added.

In turn, Section 5, Additional Provisions, included pre-printed language and handwritten additions to blank spaces specifying the following terms: an $8 million down payment against the hotel's $32 million price, 24 months of interest-only financing at a 5.5% variable rate based on the prime rate, a half-point fee for loan origination, payment due dates, a 15-day default period, and the late payment charge for any delinquent amount. These specific terms were initialed and dated by both parties, and the entire financing addendum was signed on each of its three pages by Che on August 6, 2018, and by Lexmar on August 8, 2018.[2]

The PSA also contained a feasibility contingency. This contingency would allow the buyer, Che, to walk away from the deal and receive a full refund of its earnest money unless the buyer gave written notice within 10 days of mutual

---

[2] Both parties signed an additional addendum on August 10, 2018, changing the escrow company to Chicago Title and changing the due date for the first payment for the financing.

acceptance that it waived the contingency and also paid into escrow an additional $1 million of nonrefundable earnest money.[3]

The PSA specified September 7, 2018, to close.[4] It contained an integration clause stating "[t]his Agreement and any addenda and exhibits thereto state the entire understanding of Buyer and Seller regarding the sale of the Property. There are no verbal or other written agreements which modify or affect the Agreement."

During the PSA's 10-day feasibility period, the parties began exchanging documents, and Che wired $1 million in earnest money to the parties' escrow company, Chicago Title. Nonetheless, James and MiRan emailed Paek on August 19 that they had decided "not to pursue Home2 Suites."

Che, however, continued discussing the purchase with Paek and Lexmar. Che wanted to "make sure all the document[s] that [Lexmar] drafted or created or generated is per PSA, what we agreed to"; James and MiRan were concerned that there might be some variance "[b]ecause [Lexmar was] not using standard forms." Based on Che's input, Paek wrote an "Addendum/Amendment to Purchase and Sale Agreement" (August 20 Addendum).

The August 20 Addendum recites that it "is part of the Purchase and Sale Agreement." The first paragraph[5] states "1) Concerning Financing Terms," and

---

[3] Che initially offered $300,000 in earnest money. Lexmar's counteroffer required $1 million in earnest money, and "an additional $1,000,000" of "nonrefundable" earnest money when waiving the feasibility contingency. Che accepted both changes when it signed the PSA on August 6.

[4] The PSA stated, "The sale shall be closed on or before 9/7/2018. . . . Buyer and Seller shall deposit with Closing Agent by 12:00 p.m. on the scheduled Closing date all instruments and monies required to complete the purchase in accordance with this Agreement."

[5] As the parties refer to the numbered items in the August 20 addendum as "paragraphs," we do the same.

subsequent paragraphs change the seller-financed interest rate from variable to 5.75% fixed, extend the term of seller financing from two years to 60 months, state an amortization period of 30 years with no prepayment penalty, and offer an additional year of seller financing at 6.5%. Paragraph 6 further addressed the drafting of financing terms as follows:

> 6) Financing terms must be drafted as agreed as PSA [sic] and shall be reviewed by buyer. If financing terms are not as agreed in the contract, seller must revise the terms as agreed in the contract. If seller does not revised [sic] as agreed in PSA as buyer's option, buyer can terminate the contract and the earnest money shall be returned back to buyer in full through escrow.

Paragraph 13 of the August 20 Addendum adds, "Feasibility contingency is deemed satisfied and waived and buyer is moving toward closing." Paragraph 14 of the Addendum stated that "Buyer shall put only an additional $250,000 into escrow as part of the earnest money." The Addendum ends by stating that "ALL OTHER TERMS AND CONDITIONS of the [PSA] remain unchanged." Both parties signed the Addendum on August 20, 2018.

After the August 20 Addendum was signed, pursuant to its paragraph 6, Lexmar drafted a financial term sheet summarizing the particulars of the PSA's seller financing. Paek sent this document to James and MiRan on August 22. James testified that Lexmar's financing term sheet "flustered" him because "[t]here were bank's loan assumption among other things that were never mentioned with us." Nevertheless, James marked up Lexmar's term sheet, and he released $250,000 more as additional earnest money into escrow per paragraph 14 of the August 20 Addendum. In particular, James noted concerns

5

with the reference to a loan from Anchor Bank to Lexmar, as a critical aspect of the deal for Che was seller financing solely by Lexmar.

Lexmar then prepared a revised financing term sheet. Paek emailed the revised term sheet to James on August 27. Ninety minutes after receipt, James emailed Paek, "This matter is handled [sic] over to attorney, Benjamin Lee. Any future correspondence should be done through him." Paek and Lee continued corresponding about whether Che would request further changes to the financing term sheet or request rescission. On August 31, Lexmar told Che it remained "ready, willing, and able" to close, but by then Che had informed Lexmar it would not go forward with the parties' transaction.[6]

Because the parties did not complete their transaction, Chicago Title deposited $1 million in unrefunded escrow funds[7] with Pierce County Superior Court and initiated the interpleader action below against Che and Lexmar in April 2019 to resolve their conflicting claims. The court then dismissed Chicago Title, and Che moved for summary judgment to reclaim its earnest money. The court denied that motion, and the case proceeded to a jury trial.

At trial, Che argued it was legally excused from any duty to close the parties' transaction under paragraph 6 of the August 20 Addendum and was entitled to the return of its earnest money because no enforceable contract was

---

[6] The parties do not dispute that as of August 31 Che informed Lexmar it would not close on September 7.

[7] Per paragraph 14 of the August 20 addendum and the PSA, the $250,000 in additional earnest money that Che paid into escrow upon waiver of the feasibility contingency was nonrefundable.

6

ever formed. Lexmar argued that Che had no legal excuse not to complete the purchase. The jury returned a general verdict in favor of Lexmar.

The court entered findings of fact and conclusions of law regarding fees and costs, and it entered its judgment on the jury award to Lexmar totaling over $1.5 million. Che filed a CR 59 motion for reconsideration or a new trial, which the court denied. Che appeals.

ANALYSIS

Che assigns error to the trial court's denial of its motion for summary judgment and to the trial court's entry of judgment on the jury verdict. Che also challenges the award of attorney fees and costs. Both parties seek attorney fees and costs on appeal.

A. Reviewability of trial court's denial of motion for summary judgment

Che first claims the trial court erred by denying its motion for summary judgment. Generally, a trial bars subsequent review of a denial of a summary judgment motion because the trial resolves material issues of fact. Washburn v. City of Federal Way, 178 Wn.2d 732, 745, 310 P.3d 1275 (2013) (citing Kaplan v. Nw. Mut. Life Ins. Co., 115 Wn. App. 791, 65 P.3d 16 (2003)). Lexmar urges this court to follow federal precedent and hold that "a denial of a summary judgment motion after trial is never appealable," citing Ortiz v. Jordan, 562 U.S. 180, 183-84, 131 S. Ct. 884, 178 L. Ed. 2d 703 (2011). Even assuming that is a correct interpretation of Ortiz, we decline this invitation, as the Washington Supreme Court has made clear that a limited exception to the general rule of nonreviewability exists where the denial of summary judgment turned solely on

7

an issue of substantive law rather than fact. <u>Washburn</u>, 178 Wn.2d at 745

(citing <u>Univ. Vill. Ltd. Partners v. King County.</u>, 106 Wn. App. 321, 324, 23 P.3d

1090 (2001)).[8]

We explained the reasoning for this general rule barring post-trial review

of denials of summary judgment in <u>Johnson v. Rothstein</u>, 52 Wn. App. 303, 759

P.2d 471 (1988). RAP 2.2 identifies which trial court decisions may be appealed

as a matter of right. We concluded that once a trial on the merits is held, neither

RAP 2.2(a)(1), allowing appeal from a final judgment, nor RAP 2.2(a)(3), allowing

an appeal from a decision determining the action, "permits review of a pretrial

order denying summary judgment when such denial is based on a trial court's

determination of the presence of disputed, material facts." <u>Johnson</u>, 52 Wn. App.

at 305. The reasons for such a rule are two-fold. First, the final judgment "can be

tested upon the record made at trial, not the record made at the time summary

judgment was denied." <u>Id.</u> at 306 (quoting <u>Evans v. Jensen</u>, 103 Idaho 937, 655

P.2d 454, 459 (1982)). Second, the purpose of a summary judgment procedure

is to avoid a useless trial; once a trial on the merits has occurred, reviewing a

denial of a summary judgment motion "would do nothing to further this purpose."

<u>Id.</u> at 307. Nor is there any "further relevance" to the summary judgment

procedure to determine the presence of material issues of fact. <u>Id.</u>

---

[8] In <u>Washburn</u>, the court's ruling on summary judgment was reviewable because it turned solely on an issue of pure law, the existence of a duty—specifically, whether the defendant city's police officers owed the plaintiffs' deceased mother a duty of care when serving her antiharassment order on her partner. The trial court denied summary judgment based on its determination that the officers owed the decedent two duties: to serve her antiharassment order and to act reasonably when doing so. <u>Id.</u> at 752. Because these were questions of law, the Court reached the merits on review and affirmed. <u>Id.</u> at 762. Likewise, in <u>University Village Ltd. Partners</u>, the exception applied because "summary judgment was based on a legal conclusion"— the meaning of art. VII, § 1 of the Washington State Constitution. 106 Wn. App. at 324-25.

Here, in contrast to Washburn and University Village Ltd. Partners, the denial of summary judgment did not turn on a pure issue of law. At summary judgment, Che argued that the parties had no meeting of the minds on the PSA because they never reached agreement on the material term of seller financing either in the PSA or the August 20 Addendum. Specifically, Che focused on paragraph 6 of the August 20 Addendum to the PSA, which stated that "[f]inancing terms must be drafted as agreed as [sic] PSA and shall be reviewed by buyer." Che argued that Lexmar never drafted the key financing terms as agreed in the PSA, and thus, paragraph 6 provided Che with a legal excuse: "buyer can terminate the contract."

"A valid contract requires the parties to objectively manifest their mutual assent to all material terms of the agreement." P.E. Sys., LLC v. CPI Corp., 176 Wn.2d 198, 209, 289 P.3d 638 (2012). "Normally, the existence of mutual assent or a meeting of the minds is a question of fact" for the jury. Sea-Van Inv. Assocs. v. Hamilton, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994). Here, Che contends that because paragraph 6 is unambiguous, and the interpretation of an unambiguous contractual term is a matter of law, this court may review the denial of its summary judgment motion. But the threshold question—whether there was a meeting of the minds—is normally not a question of law.[9]

---

[9] See jury instruction no. 4 ("Che Investments has the burden of proving that it had a legal excuse not to complete the purchase of the hotel from Lexmar Hospitality."). By contrast, we may determine a contract's proper interpretation as a matter of law if it does not turn on the credibility of or reasonable inferences drawn from extrinsic evidence. Kofmehl v. Baseline Lake, LLC, 177 Wn.2d 584, 594, 305 P.3d 230 (2013).

It is true that a question of fact may be determined as a matter of law if reasonable minds could not differ. Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 178 n.10, 94 P.3d 945 (2004) (citations omitted). But such a determination requires the court to review evidence, rather than determine a "pure" issue of law. Here, because there was a disputed question of fact rather than a pure question of law, the usual rule applies and post-trial review of the trial court's decision denying summary judgment is barred. See Johnson, 52 Wn. App. at 305.

B. Denial of CR 59(a)(7) motion

In the alternative, Che argues the trial court erred in denying its CR 59(a)(7) motion because the verdict was "contrary to law."[10] Che argues—as it did in answering Chicago Title's interpleader complaint, on summary judgment, at trial, and in its CR 59 motion—that the PSA was an unenforceable agreement to agree and Lexmar never drafted the material financing terms, the debt instruments, for Che's review.

CR 59(a), New Trial, Reconsideration, and Amendment of Judgments, states:

> On the motion of the party aggrieved, a verdict may be vacated and a new trial granted to all or any of the parties, and on all issues, or on some of the issues when such issues are clearly and fairly separable and distinct, or any other decision or order may be vacated and reconsideration granted. Such motion may be granted for any one of the following causes materially affecting the substantial rights of such parties:

---

[10] Che's briefing also assigns error to the court's denying its motion for judgment as a matter of law, even though it did not file any CR 50 motion. At oral argument, Che conceded this assignment of error was "wrong." Regardless, "[a] directed verdict, judgment notwithstanding the verdict, or motion for new trial on sufficiency of the evidence each involve the same standard of review." Lockwood v. AC & S, Inc., 44 Wn. App. 330, 353, 722 P.2d 826 (1986).

. . .

(7) That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law.

We review a trial court's decision on a motion under CR 59(a)(7) for abuse of discretion. Kohfeld v. United Pac. Ins. Co., 85 Wn. App. 34, 40, 931 P.2d 911 (1997) (citing Detrick v. Garretson Packing Co., 73 Wn.2d 804, 812, 440 P.2d 834 (1968)). A trial court abuses its discretion when its decision is manifestly unreasonable, or based on untenable grounds or reasons. Kohfeld, 85 Wn. App. at 40. When an order granting or denying a new trial is "predicated upon rulings as to the law . . . no element of discretion is involved." Johnson v. Howard, 45 Wn.2d 433, 436, 275 P.2d 736 (1954).

The grant of a motion for a new trial is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or reasonable inferences to sustain the verdict for the nonmoving party. Hizey v. Carpenter, 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992). There must be "substantial evidence," as distinguished from a "mere scintilla" of evidence, to support the verdict—i.e., evidence of a character "which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed." Sommer v. Dep't of Soc. & Health Servs., 104 Wn. App. 160, 172, 15 P.3d 664 (2001) (citing Hojem v. Kelly, 93 Wn.2d 143, 145, 606 P.2d 275 (1980) (internal quotations omitted)).

In the present case, to prevail in the interpleader action below, Lexmar had to establish that the parties formed an enforceable agreement and that it

11

performed its duty to draft financial terms in accordance with that agreement such that Che did not have a legal excuse to terminate the transaction.[11] Thus, to determine whether the trial court abused its discretion in denying Che's CR 59 motion, we must determine whether, viewing the evidence in the light most favorable to Lexmar as the nonmoving party, the record contains substantial evidence to support the jury's verdict awarding the interpleaded earnest money to Lexmar.

      1.  <u>Did the parties form an enforceable agreement?</u>

The jury was instructed that forming a contract requires mutual assent and consideration regarding the same essential terms.[12] Here, the record shows that on August 6 Che offered to put $300,000 down on a purchase price of $32 million for the Home2 Suites hotel. The purchase would close on September 7 once a 10-day feasibility condition was waived. Lexmar would provide seller financing, for which Che would put $8 million down and make interest-only payments for 24 months at a 5.5% variable rate and also pay a half-point loan origination fee.[13] Che's initial offer specified the use of standard form debt instruments, the

---

[11] Jury instruction no. 4 states in its entirety:
     Each party has the burden of proving that is entitled to the $1,000,000 of earnest money that Chicago Title deposited with the Court.
     Che Investments has the burden of proving that it had a legal excuse not to complete the purchase of the hotel from Lexmar Hospitality.
     Lexmar Hospitality has the burden of proving that Che Investments had no legal excuse not to complete the purchase of the hotel from Lexmar Hospitality.
     You should find in favor of the party that has met its burden of proof.

[12] The parties do not dispute that this is a correct statement of the law. <u>See, e.g.</u>, <u>P.E. Sys.</u>, 176 Wn.2d at 207.

[13] The offer also included details about the timing of payments, duration of the financing, the default period and interest rates during default, and prepayment. Altogether the form offer contained 23 pages with 28 main clauses and 6 addenda covering financing, utilities, affiliated businesses, agents, continuing operations, staff, training, payroll, commission, franchisor approval, mechanical equipment, and a legal description of the property.

Commercial Brokers Association's (CBA) forms, to document Lexmar's seller financing. In the event of buyer's default without legal excuse, the form PSA provided that the seller could keep the earnest money as liquidated damages, sue for actual damages, sue for specific performance, or pursue any other rights or remedies.

The evidence at trial further showed that on August 8, Lexmar made a counteroffer. It did not change the hotel's price, the date of closing, or the 10-day contingency period, but it did increase the down payment to $1 million and require an additional $1 million of nonrefundable earnest money to waive the contingency. Further, the counteroffer added conditions to, and changed the documentation of, the seller financing it would provide.[14] The counteroffer specified that the prime rate was currently 4.5%, that the loan was subject to a "comfort letter" from the hotel's franchisor,[15] and that Lexmar would have access to Che's records to ensure Che promptly cured any problems with the franchisor. For the financing, Lexmar's counteroffer specified the use of non-CBA debt instruments including a loan agreement, promissory note, deed of trust, personal guaranty, and "any other commercially reasonable documents required." At trial, both Che and Lexmar testified that because Lexmar would be financing the purchase, they both read this clause to mean that Lexmar would draft the loan documents for Che's review.

---

[14] Lexmar's counteroffer proposed 26 changes to Che's offer.
[15] Lexmar's real estate attorney, Sandip Soli, testified that a "comfort letter" is a letter from the hotel franchise—here, Hilton—that is very typical in hotel transactions and provides the lender the right to cure defaults by the operator so it can continue to operate as that brand.

Che initialed each change the day the counteroffer was made, August 8. Thus, the record contains substantial evidence showing Che made an offer that Lexmar countered, and Che accepted, evidenced by their both having signed the PSA obligating Che to pay $32 million for the Home2 Suites hotel with seller financing provided by Lexmar.

James told Paek on August 19 that Che had decided "not to pursue Home2 Suites."[16] However, the parties do not dispute that on August 20, the same day the 10-day contingency period was to expire, they signed an addendum to their PSA. This August 20 Addendum recites that it "is part of the Purchase and Sale Agreement." Its first paragraph changes the seller-financed interest rate from 5.5% variable to 5.75% fixed, extends the term of seller financing from 24 to 60 months, states an amortization period of 30 years with no prepayment penalty, and offers an additional year of seller financing at 6.5%. Significantly, given the expiration of the contingency period that same day, it states the "[f]easibility contingency is deemed satisfied and waived and buyer is moving toward closing." The very next sentence states, "Buyer shall put only an additional $250,000 into escrow as part of the earnest money." The Addendum ends by stating that "ALL OTHER TERMS AND CONDITIONS of the [PSA] remain unchanged." Thus, the record contains substantial evidence showing the

---

[16] If this were the end of the matter, the PSA unambiguously would have allowed Che to reclaim its $1 million down payment under clause 2 as it had not waived the feasibility contingency or paid into escrow the nonrefundable additional amount required for waiver under clause 5 (which was $1 million prior to the August 20 Addendum).

parties modified the original PSA they had entered into on August 8.[17] Che waived the PSA's feasibility contingency before it expired in exchange for improved seller financing terms from Lexmar.

Che argues that Lexmar never drafted the material seller financing terms, i.e., the debt instruments, for its review, so the PSA was an unenforceable agreement to agree. An agreement to agree, which is "an agreement to do something which requires a further meeting of the minds of the parties and without which [the agreement] would not be complete," is unenforceable. Keystone, 152 Wn.2d at 175-76.

In Keystone, the buyer claimed an exchange of letters between its broker and the seller's broker created an enforceable contract to negotiate and prepare a purchase and sale agreement because "all the key terms of the substantive agreement were settled." Id. at 174-75. The Court reasoned that the buyer had not identified "an offer and acceptance to be bound to specific standards of negotiating conduct for the formation of a separate substantive contract" where the seller's letter stated it was "prepared to negotiate a Purchase and Sale Agreement." Id. at 178-79. There was no objective manifestation by the seller of an intent to be bound if the buyer accepted the modifications proposed by the seller. Id. at 179. Thus, the Court reasoned, "[i]n the absence of objective manifestations of mutual assent to definite terms supported by consideration, no

---

[17] The parties also signed an addendum to the PSA on August 10, but these provisions are not material to the dispute. Therefore, we refer to August 8 as the date the parties signed the original PSA.

contract was formed." Id. The Court held the letter presented "[a]t best . . . an implied agreement to agree." Id. at 180.

Similarly, Hubbell v. Ward, 40 Wn.2d 779, 246 P.2d 468 (1952), involved an agreement to sign a future contract rather than an enforceable agreement. A purchaser agreed to pay $9,000 down "and sign a contract for the balance, payable at $200.00 or more per month, including interest at the rate of 5%" for a $29,000 apartment building. Id. at 780. The seller refused to close, and the purchaser sued for specific performance, which the trial court granted. Id. at 780-81. The Court held this was error because there was "no understanding between the parties as to what the[ ] additional terms should be" in their future contract. Id. at 782.

Courts have also held that parties did not enter into an enforceable agreement when the parties have not agreed on the material terms. For example, in Sea-Van, a buyer and two sellers exchanged correspondence concerning the sale of two adjoining parcels of real property. 125 Wn.2d at 123. The buyer offered two different purchase options, one of which was for $3,000 per acre, 20% down, with the balance on an interest-only two-year note at 10% per year, subject to the two parcels closing together and proof of clear title. Id. The sellers purported to accept the option of $3,000 per acre, but added the conditions that payment on the note be made quarterly and that the two parcels close separately. Id. at 123, 127. When the buyer inquired about closing, the sellers refused to sell, and the buyer sued for specific performance. Id. at 124-25. The trial court determined no contract was formed because the buyer's and sellers'

minds did not meet on the terms of the promissory note, the terms of a deed of trust, the type of deed, the time of closing, or the payment of taxes. Id. The Supreme Court agreed with the trial court because "[t]here was no meeting of the minds here as to any of the material terms of the contract except for the price." Id. at 129.

In the present case, unlike the letters in Keystone that were insufficient to establish agreed terms, the parties here used a commercial brokers' association form purchase and sale agreement with blanks for material terms. The parties filled in the blanks and interlineated the comprehensive form contract with additional details in both the offer and counteroffer, and both parties accepted the written terms by initialing each change and signing and dating each page. The signed PSA and August 20 Addendum evidence an objective manifestation of definite terms supported by consideration.

Moreover, unlike in Sea-Van and Hubbell, here, the parties' PSA and the August 20 Addendum contained all the material terms essential to the sale of the Home2 Suites hotel. The parties' PSA, based on a CBA form and further customized by the parties, spans 23 pages that contain 28 main clauses. The financing addendum to the original PSA includes details about the timing of payments, duration of the financing, the default period and interest rates during default, and prepayment. There are six additional addenda to the original PSA covering financing, utilities, affiliated businesses, agents, continuing operations, staff, training, payroll, commission, franchisor approval, mechanical equipment, and a legal description of the property. And as evidenced by the August 20

Addendum, Che negotiated better terms and modified the original PSA on the critical issue of seller financing, including the interest rate (5.75% fixed), term (60 months), amortization period, and adding the option of an additional year of seller financing at 6.5% interest.

In support of its position that the parties did not agree on all material terms, Che points out that the "actual form and content of the Loan Documents referenced in Section 3(a)," the debt instruments comprising "the loan agreement, promissory note, deed of trust, personal guaranty, and any other commercially reasonable documents required by Seller" to close, "were never presented to Che prior to the parties' countersigning the August 8, 2018 PSA." Even Lexmar's revised term sheet, Che argues, referred to debt instruments not mentioned in the PSA, such as an assignment of rents, a security agreement, personal guarantees, an environmental indemnity, and a management agreement.

But at trial, Lexmar's expert, Christopher Brain, testified that it is industry practice and commercially reasonable to draft instruments such as the deed of trust, promissory note, and security documents after the purchase and sale agreement: "In other words, you have a binding purchase and sale agreement, and then the documents, the implementing documents . . . are drafted after that. And generally, they only have to be done by closing, which is the date you actually close the transaction."[18] Che did not counter this evidence at trial with

---

[18] Asked about whether Anchor Bank's loan documents were disclosed in the PSA, Lexmar's transaction attorney Solip testified that "in [his] experience, we wouldn't have done that," and he has "never in 20 years, ever seen that disclosed in the PSA." He also stated that the deed of trust "would have been disclosed in the title report," which was "usually a separate

expert testimony. In the present case, there is substantial evidence of offer and acceptance as to material terms. See Keystone Land & Dev. Co., 152 Wn.2d at 178 ("Generally, manifestations of mutual assent will be expressed by an offer and acceptance.").

When documents containing material terms are referenced but not included or attached to the contract, courts have denied specific performance on the contract. For example, in Kruse v. Hemp, 121 Wn.2d 715, 853 P.2d 1373 (1993), a lessee sued for specific performance to enforce a lease provision giving him an option to buy. Id. at 718. However, the lease did not have any attached real estate purchase and sale agreement to which the parties had agreed. Id. at 723. The Court reversed specific performance granted to the lessee after it concluded no meeting of the minds occurred as to material and essential terms because the parties did not refer to or attach an agreed-upon real estate contract form, as is standard practice in Washington. Id.

Similarly, in Setterlund v. Firestone, 104 Wn.2d 24, 700 P.2d 745 (1985), a buyer sought specific performance of an earnest money agreement that required the attachment of the parties' promissory note and deed of trust, but neither was attached. Id. The Court affirmed dismissal by the trial court because the buyer "never even offered or introduced those two documents which would cast into legal formality the terms and conditions upon which the seller's security depended." Id. at 26.

---

document" in the control of the title company, and the title report did not exist when the PSA was signed, because "usually the title report gets issued after the folks sign the PSA."

19

By contrast, in the present case, while the PSA and the August 20 Addendum refer to other documents necessary to close, such as the promissory note, debt instruments, and financing term sheets, they do not require them to be attached or refer to them as attached. Moreover, the PSA and August 20 Addendum already contain all the material terms. As analyzed above, trial testimony established that it is customary for the parties to complex transactions to agree to term sheets summarizing financial details from which the debt instruments required to close a transaction are prepared immediately prior to closing. The plain language of paragraph 6 requires Lexmar to draft "[f]inancing terms" for Che to review, not the debt instruments themselves. Paragraph 6 does not introduce new financing terms to the parties' agreements. Rather, it states three times that Lexmar must draft terms that conform to what the parties already agreed to: "Financing terms must be drafted as agreed as [sic] PSA," "seller must revise the terms as agreed in the contract," and "[i]f seller does not revise[] as agreed in PSA . . . buyer can terminate the contract . . . ." The PSA or any of the multiple addenda, including the August 20 Addendum, could have required Lexmar to draft the actual debt instruments required to close the transaction for Che's review, but they did not do so.

2. Did Lexmar perform its duty to draft financing terms in accordance with the August 20 Addendum?

Because the parties entered into an enforceable agreement, the next issue is whether Che had a legal excuse not to close on the hotel purchase.[19]

_____

[19] Che's waiver of the PSA's feasibility contingency relinquished its right not to close the transaction, as set out in the PSA, paragraph 5. But it could still have a legal excuse not to close pursuant to the August 20 Addendum. Accordingly, as noted previously, the jury received this

Paragraph 6 of the August 20 addendum gave Lexmar the duty to prepare

financing terms as agreed to in the original PSA:

> 6) Financing terms must be drafted <u>as agreed as [sic] PSA</u> and
> shall be reviewed by buyer. If financing terms are not as agreed in
> the contract, seller must revise the terms as agreed in the contract.
> <u>If seller does not revised [sic] as agreed</u> in PSA as buyer's option,
> buyer can terminate the contract and the earnest money shall be
> returned back to buyer in full through escrow.

Every contract involves an implied duty of good faith and fair dealing. <u>Badgett v.</u>

<u>Sec. State Bank</u>, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This duty requires

that the parties perform the terms of the agreement in good faith. <u>Id.</u> However,

the implied duty does not permit the parties to add or contradict the terms of the

agreement. <u>Id.</u> at 572; <u>Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.</u>, 86

Wn. App. 732, 738, 935 P.2d 628 (1997).[20]

The August 20 Addendum placed on Lexmar a duty to draft the financing

terms as previously agreed in the PSA, as well as the implied duty to act in good

faith in drafting the term sheet. Paragraph 6's plain language would allow Che to

terminate only if Lexmar did not draft or, after Che's review, did not revise the

financing terms "as agreed" to in the parties' PSA, as modified by their August 20

Addendum.

After the August 20 Addendum was signed, on August 22, Paek emailed

Lexmar's initial seller financing term sheet to James and MiRan. The record

shows James made extensive alterations to it. In particular, Che objected to the

---

instruction: "Che Investments has the burden of proving that it had a legal excuse not to complete the purchase of the hotel from Lexmar Hospitality. Lexmar Hospitality has the burden of proving that Che Investments had no legal excuse not to complete the purchase of the hotel from Lexmar Hospitality."

[20] The jury also received instructions on the implied duty of good faith and fair dealing.

references to Anchor Bank in the term sheet. Paek then worked with Lexmar's transactional attorney to prepare a revised term sheet, which Paek sent to James on August 27. In response to Che's objections, Lexmar arranged for its loan from Anchor Bank to be fully paid off at closing, thus removing Anchor Bank from any involvement with the seller financing of Che's purchase, as reflected in the revised version of the financing term sheet. Paek advised James and MiRan that "this financing term sheet is what was agreed by buyer and seller per contract," and that Lexmar had "followed through on [its] end with the agreement."

At trial, Lexmar's commercial real estate expert, Christopher Brain linked every item on Lexmar's revised term sheet to the parties' PSA or the August 20 Addendum. Thus, there was substantial evidence that Lexmar performed its duty under paragraph 6 to draft financing terms as agreed to in the parties' PSA.[21]

Substantial evidence supports the jury's verdict awarding the interpleaded funds to Lexmar because the record shows the parties formed an enforceable agreement with the PSA and the initial addenda, and then modified that agreement with the August 20 Addendum, which was also enforceable. Substantial evidence also establishes that Lexmar drafted a revised seller financing term sheet based on the parties' agreement, thus performing its duty as set out in paragraph 6 of the August 20 Addendum. Accordingly, Che did not have a valid excuse for

---

[21] To the extent Che argues that Lexmar never drafted the debt instruments required to close their transaction on September 7, the law did not require Lexmar to tender a useless performance after Che gave notice on August 31 that it would not close. See Puget Sound Serv. Corp. v. Bush, 45 Wn. App. 312, 318, 724 P.2d 1127 (1986).

failing to complete the transaction, and the trial court did not abuse its discretion by denying Che's motion for reconsideration or a new trial under CR 59(a)(7).

### C. Attorney Fees and Costs

Che also assigns error to the court's award of fees and costs to Lexmar. Under RCW 4.84.330, a prevailing party in any action to enforce a contract or lease that provides for attorney fees and costs is entitled to reasonable fees and costs. Clause 21 of the parties' PSA states, "[I]f Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses. In the event of trial, the amount of the attorney's fee shall be fixed by the court." Because Lexmar is the prevailing party, the trial court properly awarded it fees and costs per the parties' PSA.[22]

Lexmar also requests fees on appeal under RAP 18.1(b), citing to the parties' prevailing party clause in the PSA. A contract that provides for attorney fees at trial also supports such an award on appeal. Atlas Supply, Inc. v. Realm, Inc., 170 Wn. App. 234, 241, 287 P.3d 606 (2012). Therefore, as Lexmar is the prevailing party on appeal, we award it fees and costs on appeal, conditioned on its compliance with RAP 18.1.

Affirmed.

---

[22] The court used the lodestar method to calculate the award, and Che did not oppose the amounts Lexmar claimed in its motion for fees and costs.

No. 84231-5-I/24

_Chung, J._

WE CONCUR: